887 N.E.2d 158 (2008)
In the Matter of the Termination of the Parent-Child Relationship of A.B., a Child, and
Dawn B., Appellant-Respondent,
v.
Department of Child Services, Appellee-Petitioner.
No. 02A03-0712-JV-599.
Court of Appeals of Indiana.
May 30, 2008.
*160 Daniel G. Pappas, Fort Wayne, IN, Attorney for Appellant.
Alisa L. Rude, Fort Wayne, IN, Attorney for Appellee.

OPINION
CRONE, Judge.

Case Summary
Appellant Dawn B. ("Mother") appeals the involuntary termination of her parental rights, in Allen Superior Court, to her daughter A.B. We affirm.

Issues
Mother raises several issues on appeal that we consolidate and restate as:
I. Whether the Allen County Department of Child Services ("ACDCS") violated Indiana Code Section 31-34-1-16 when it initiated involuntary parental termination proceedings; and,
II. Whether the trial court's judgment is supported by clear and convincing evidence.

Facts and Procedural History
A.B., born on August 16, 1996, is the biological daughter of Mother.[1] A.B. was hospitalized by Mother for violent, uncontrollable behavior on March 17, 2001, May 15, 2001, and October 5, 2001. On August 6, 2002, Mother admitted A.B. to Parkview Behavioral Health for out-of-control, dangerous, and aggressive behaviors. Several days later, on August 9, 2002, ACDCS received a referral alleging A.B., who was six years old at the time, had engaged in sexual behavior with her eleven-year-old brother. An investigation ensued. On October 8, 2002, the trial court issued an Order on Detention Hearing and/or Preliminary Inquiry wherein the court: (1) found probable cause existed to believe that A.B. was a Child in Need of Services ("CHINS"); (2) authorized the ACDCS to *161 file a CHINS petition as to A.B.; and, (3) ordered that A.B. remain in the custody of Parkview Behavioral Health until released from treatment and thereafter placed in an appropriate Residential Treatment Program.
The ACDCS filed a petition alleging A.B. was a CHINS on November 18, 2002. On December 3, 2004, at the initial hearing on the CHINS petition, Mother admitted to the following allegations:
C. Prior to her admission into Parkview Behavioral Health, [A.B.] ran around uncontrollably, hitting [her] head on objects and hit, bit and scratched [Mother].
D. [A.B.] regularly exhibits behavior consisting of hitting, kicking, biting and screaming.
E. [A.B.] was hospitalized for violent, uncontrollable behavior on March 17, 2001, May 15, 2001 and October 5, 2001.
F. [A.B.] bites herself, runs head first into walls and doors, and head butts other people.
G. [A.B.'s] violent behavior endangers her own health and the health of others.
H. [A.B.] endangers herself by frequently leaving the house without notice and entering the home of strangers.
I. [A.B.] exhibits inappropriate sexual behavior by pulling her pants down and her shirt up in front of boys.
J. [A.B.] has reported that her brother touches her private areas with toys.
K. Due to [A.B.'s] behavior, [Mother] is unable to provide necessary care and supervision for [A.B.]
L. [A.B.] has participated in Park Center's Placement Diversion Program, Home-based Services and in-patient hospitalization, but [A.B.] has not benefited from those services.
M. [A.B.] needs additional Court ordered services to help manage her behavior problems and to ensure her safety and the safety of others.
N. [Mother] needs Court ordered services to enable her to provide necessary care and supervision for [A.B.]
Appellant's App. at 387-88; State's Ex. 4, pp. 2-3.
On December 3, 2002, the trial court found A.B. to be a CHINS and entered a Dispositional Order, inclusive of a Parent Participation Plan, which directed Mother to, among other things: (1) maintain clean, safe, and appropriate housing, (2) obtain and maintain suitable employment, (3) enroll in family counseling at Crossroads when deemed appropriate by the child's therapist, attend all classes and successfully complete the counseling program, (4) cooperate with service providers and Crossroads to establish and consistently enforce appropriate rules in the family home, (5) cooperate with the child's therapist and casemanager in developing/accepting training for parenting skills, and (6) appropriately participate in all visits with A.B. as directed.
On September 30, 2003, the trial court issued an Order on Permanency Hearing and Periodic Review ordering that A.B. be reunified with Mother on October 3, 2003, with wardship anticipated to occur within twelve months. However, three months later, on January 22, 2004, the trial court entered an Order on Detention Hearing finding that A.B., who was currently under the supervision of the ACDCS but in the home of Mother, was "not progressing well" and determined that the placement with Mother was no longer appropriate. State's Ex. 10. Accordingly, A.B. was ordered removed from Mother's care and *162 placed in Crossroads Children's Home's ("Crossroads") Secure Unit.
On July 19, 2005, the trial court adopted concurrent Permanency Plans for A.B. The first plan contained a stated goal of reunification with Mother. The second Permanency Plan indicated that A.B.'s behaviors deteriorated after therapeutic visits with Mother. It further stated that it was determined at a treatment review conference, with Mother in attendance, that reunification of the child and Mother would likely not be accomplished. Thus, the goal of the second Permanency Plan was termination of Mother's parental rights.
On July 22, 2005, the ACDCS filed a petition seeking the involuntary termination of Mother's parental rights. On June 30, 2006, the trial court again adopted concurrent permanency Plans for A.B., one being reunification with Mother, the other with a stated goal of termination of Mother's parental rights. The June 30th Permanency Plan also ordered Mother to cooperate with the ACDCS by participating in a psychological evaluation, including I.Q. testing. Mother failed to comply with the court's order for nine months until just prior to the fact-finding hearing on the termination petition.
On March 13, 2007, a fact-finding hearing on the termination petition commenced. The hearing continued on March 20, 2007, March 27, 2007, and finally concluded on May 23, 2007. The trial court issued its judgment terminating Mother's parental rights to A.B. on August 21, 2007. This appeal ensued.

Discussion and Decision

I. Application of Indiana Code Section 31-34-1-16
We first address Mother's contention that termination of her parental rights was contrary to Indiana Code Section 31-34-1-16. Specifically, Mother states that Indiana Code Section 31-34-1-16 prohibits termination where the child is voluntarily placed outside the home for treatment or care and argues, "A.B. has multiple diagnosis which led to her removal from [Mother]. She was, and remains, a danger to herself and others. A.B. still requires care for her diagnosis[,]" but despite these facts, the ACDCS sought termination of her parental rights "contrary to Indiana law." Appellant's Br. at 7-8.
Mother's assertion on appeal presents a case of first impression. In relevant part, Indiana Code Section 31-34-1-16(a) provides that the Department of Child Services "may not . . . initiate a court proceeding to . . . terminate the parental rights concerning . . . a child with an emotional, a behavioral, or a mental disorder . . . who is voluntarily placed out of the home for the purposes of obtaining special treatment or care, solely because the parent, guardian, or custodian is unable to provide the treatment or care." (Emphasis added.) The fundamental purpose of this statute is to enable and encourage families that are in distress to seek professional mental health assistance without fear of losing their children.
Here, it is undisputed that in August 2002, prior to the initiation of the underlying CHINS proceedings, Mother voluntarily placed A.B. in residential treatment at Parkview Behavior Health, a licensed health care facility in her community, due to A.B.'s out-of-control, dangerous, and aggressive behaviors. Thus, Mother is correct in her assertion that Indiana Code Section 31-34-1-16 is applicable to this case. The ACDCS was therefore prohibited from initiating termination proceedings solely because Mother was unable to provide the treatment or care that A.B. needed. Our review of the record, however, leaves this Court convinced that the *163 ACDCS did not initiate termination proceedings solely because Mother was unable to provide A.B. with the care that she needed.
The ACDCS's current involvement with A.B. and Mother stems from a referral the ACDCS received while A.B. was residing at Parkview Behavioral Health. The referral alleged then six-year-old A.B. had participated in inappropriate sexual conduct with her eleven-year-old brother. Following a preliminary inquiry, the ACDCS requested, and the trial court ordered, that A.B. be deemed a CHINS. The trial court thereafter removed A.B. from Mother's care and custody, and ordered that A.B. "continue in placement at Parkview Behavioral Health" until she could be "placed in an appropriate Residential Treatment Program." State's Ex. 6, p. 3. For approximately four years after the CHINS determination, the ACDCS attempted to reunite Mother and A.B. by offering numerous services to the family including individual and family counseling, residential treatment, home-based services, psychological evaluations, and visitation. Nevertheless, Mother was still unable to provide A.B. with the care and treatment she required.
On June 30, 2006, the trial court ordered the permanency plan to be changed from "reunification" to "termination" of parental rights because Mother "[was] in non-compliance with the Parent Participation Plan." State's Ex. 18, p. 1. When asked during the termination hearing why the ACDCS chose to initiate termination proceedings despite the fact Mother had "for the most part . . . completed the Parent Participation Plan with some bumps, with some issues[,]" ACDCS Case Manager Kristie Howard responded:
[O]ver the past six years[,] we've been providing [Mother] and . . . [A.B.] with services . . . several different kinds of services in order to help with reunification and [to] try to get this family back together and those efforts have been unsuccessful. . . . [A]nd this child . . . is in [] need of a permanent place . . . a family that will be able to take care of her special needs . . . on a permanent basis.
Tr., Vol. 3., pp. 28-29. When further questioned as to whether Mother was able to provide appropriate care for A.B., Howard responded:
No. . . . [Mother] has demonstrated that she's got her own issues that are difficult to move past which was her reasoning for putting off family counseling because she needed to deal with her own issues before addressing the issues between her and [A.B.].... [A]nd [Mother] has yet to demonstrate that she's been able to move past her own issues in order to put her daughter first.
Id. at 29. Additionally, the record reveals that Mother, who was diagnosed with moderate to severe depression, refused to participate in a court-ordered psychological evaluation for over nine months, thereby preventing the ACDCS from pursuing and developing the best possible approach to reunification of the family. Likewise, Mother refused to participate in individual counseling which would have helped her to address her own psychological issues, issues that were interfering with her ability to parent A.B.
Based on the foregoing, we conclude that Indiana Code Section 31-34-1-16 does not preclude the initiation of termination proceedings under the facts of this case. Although A.B. was voluntarily placed at Parkview Behavioral Health by Mother, termination proceedings were not initiated solely because Mother was unable to provide the care A.B. required. Rather, termination proceedings were also initiated due to Mother's refusal to cooperate with *164 service providers as well as her failure to participate in counseling to address her own mental issues, thereby making Mother both unable and unwilling to provide adequate care for A.B. We therefore find no error.[2]

II. Clear and Convincing Evidence
Next, Mother asserts that the trial court's judgment is not supported by clear and convincing evidence.
This Court has long had a highly deferential standard of review in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind.Ct.App. 2001). Thus, when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 264 (Ind.Ct.App.2004), trans. denied. We consider only the evidence and reasonable inferences that are most favorable to the judgment. Id.
Here, the trial court made specific findings in terminating Mother's parental rights. Where the trial court enters specific findings of fact, we must first determine whether the evidence supports the findings. Id. Then, we determine whether the findings support the judgment. Id. We will not set aside the trial court's judgment terminating parental rights unless it is clearly erroneous. Rowlett v. Vanderburgh County Office of Family & Children, 841 N.E.2d 615, 620 (Ind.Ct.App. 2006), trans. denied. A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. D.D., 804 N.E.2d at 264. A judgment is clearly erroneous only if the findings of fact do not support the trial court's conclusions thereon, or the conclusions thereon do not support the judgment. Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind.1996).
"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct.App.1996), trans. denied. However, these parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. Id. Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. K.S., 750 N.E.2d at 836.
In order to terminate a parent-child relationship, the State is required to allege and prove by clear and convincing evidence that:
(A) [o]ne (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
. . .
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
*165 Ind.Code § 31-35-2-4(b). The State must establish each of these allegations by clear and convincing evidence. Egly v. Blackford County Dep't of Pub. Welfare, 592 N.E.2d 1232, 1234 (Ind.1992).
Mother does not challenge the trial court's finding that A.B. had been removed for more than six months under a dispositional decree, or that the ACDCS has a satisfactory plan for A.B.'s care and treatment. Mother does, however, challenge the evidence supporting the remaining factors set forth above.

A. Conditions Will Not be Remedied & Parent-Child Relationship Poses a Threat
Mother first challenges the trial court's determination that the ACDCS proved by clear and convincing evidence: (1) that the conditions resulting in A.B.'s removal and continued placement outside of her care will not be remedied, and (2) that continuation of the parent-child relationship poses a threat to A.B.'s well-being. Specifically, Mother asserts she "took the proper steps to have A.B. treated for her behavioral problems" and that "[a]ll of the evidence was that [Mother] was appropriate with the child, but that the child suffered from conditions and a diagnosis that required extensive care that no parent could provide without some sort of professional assistance." Appellant's Br. at 5.
Initially, we note that Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Thus, it requires the trial court to find only one of the two requirements of subsection (B) by clear and convincing evidence. See In re L.S., 717 N.E.2d 204, 209 (Ind.Ct.App.1999), trans. denied (2000), cert. denied (2002). We will first review whether the trial court's finding that continuation of the parent-child relationship poses a threat to A.B.'s well being is supported by clear and convincing evidence.
In determining that continuation of the parent-child relationship poses a threat to A.B.'s well being, the trial court made the following pertinent findings:
4. It is established by clear and convincing evidence that the allegations of the Petition are true in that there is a reasonable probability that the conditions that resulted in the child's removal and the reasons for the placement outside the parent's home will not be remedied, and/or that continuation of the parent/child relationship poses a threat to the well-being of the child.
. . . .
Evidence presented at the Termination Hearing revealed that the child, [A.B.], has been diagnosed with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder and Impulse Control Disorder. Additionally, the child's therapist from Crossroads indicated that she has been sexually abused. At trial, one of the child's therapists from Crossroads testified that the child is in need of a consistent, structured setting and that her caregiver would need to be firm, yet compassionate because of the child's limit testing. Additionally, the child's therapist testified that as of her last interaction with the child and her mother, the mother did not possess the qualities or skills necessary to provide such an environment for the child. She further testified that the mother had difficulty in managing her emotions and that the child is sensitive to her mother's emotions. The therapist testified that the mother's inability to manage her emotions has a direct and negative impact upon the child's moods, affect and emotions.
A second therapist from Crossroads testified that during her involvement with the family, the child and [M]other progressed *166 in therapy and treatment to the point that Crossroads and the [ACDCS] believed that reunification was possible. The therapist testified that the child was reunited with her mother in October of 2003, however, the child had to be removed from the mother's home approximately three months later in January of 2004, because the child's behavior had deteriorated and she had become out of control. The therapist testified that on the day that the child was removed from the mother's home in January of 2004, the mother was lying on the floor and begging the [ACDCS] to take the child because she could not handle the child anymore. The therapist testified that she attributed the child's decline in behavior to a lack of routine and structure in the mother's home and to the fact that the mother seemed more focused on her own needs than those of her daughter. The therapist testified that upon the child's return to Crossroads in January of 2004, she noticed that the child had regressed significantly since her return to the mother's home. The therapist testified that in her opinion, based upon her direct interactions with the family from September of 2002, through November of 2004, and from her supervision of the therapist who replaced her which supervision ended in August of 2006, she did not believe that the mother had the ability to provide the child with the care and treatment that she needed.
Appellant's App. at 388.
These findings are supported by the evidence. The record reveals that throughout the duration of the CHINS and termination proceedings, Mother struggled to meet her own personal and emotional needs. Psychologist Dr. Jennifer Fray testified that Mother suffers from moderate to severe depression. When questioned as to whether she had any significant concerns with regard to Mother being in charge of "a young child with special needs, specifically, a child that would require boundaries, security, structure, [and] . . . [twenty-four] hour monitoring," Dr. Fray responded, "Yes. . . . [S]uch a child would be overwhelming to [Mother]." Tr., Vol. 2, p. 46.
The evidence further establishes A.B. repeatedly experienced significant regression after spending unsupervised time at home with Mother. The first such instance occurred after A.B. was returned to Mother's care in October 2003. Crossroads Case Manager Megan Kelly testified that while visiting the home, she observed A.B.'s behavior continue to spiral downward due to Mother's failure to provide structure in the home. Kelly further stated that by January 2004, A.B. "was completely out of control, she was running around the house screaming, she was hitting her mother, she kicked me a couple of times" and had to be restrained a couple of times. Tr., Vol. 1, p. 95. During her last home visit, Kelly had to call Crossroads for backup, and when the Crossroads staff arrived, Mother was lying on the floor "just screaming, [`][T]ake her, take her, I can't handle her, she's got to go, she's got to go, she's got to go.[']" Id. at 96. When asked to describe A.B.'s condition upon her return to Crossroads following this incident in January 2004, as compared to her condition immediately before being placed with Mother in October 2003, Kelly responded:
[T]here was a fairly significant regression in behaviors . . . whereas before [A.B.] had gone home, while her behavior certainly was not perfect[,] there wasn't the self-harm, the biting, the pulling of hair, the scratching her face, the hitting herself, for a period of time. When she got back to Crossroads, those sorts of behaviors resumed for a period of time and we really had to do a lot of *167 work to get her back to the point that she was functioning better.
Id. at 100-01.
By late September or early October 2004, A.B. had again achieved significant progress and was allowed to participate in off-campus activities including Upward Cheerleading and short unsupervised visits with Mother. However, directly following an awards banquet and an unsupervised visit with Mother, A.B. again began exhibiting erratic behavior and a lot of regression, including self-harm, bedwetting, and play that was consistent with traumatic types of play. Kelly testified that A.B.'s pattern of regression always seemed "linked" to Mother's care and stated, "[A]fter [A.B.] came back the second time . . . to Crossroads, we began to see a pattern of behaviors . . . directly following visits with [Mother] where [A.B.'s] behavior would not be at the same level as right before she visited with [Mother]." Tr., Vol. 2, p. 22. Kelly described A.B.'s behaviors as "anxiety type behaviors" such as scratching herself and pounding her head on the wall. Id.
Barbara Schultz, A.B.'s therapist at Crossroads, testified that Mother had difficulty managing her emotions so as not to affect A.B. In so doing, Schultz stated:
[A.B.] is very sensitive to her mother's emotions . . . is able to quickly read her mom, . . . and depending on how [Mother] was presenting and interacting . . . during those [counseling] sessions [it] would affect [A.B.] If [Mother] was upset about an issue . . . [A.B.] would quickly read that and would either shut down . . . [or] would have behaviors . . . to disrupt things.
Tr. Vol. 1, pp. 58-59. Despite Mother's effect on A.B., by the time of the termination hearing, Mother still was not participating in individual counseling to address her own emotional issues.
Finally, Beth Weber, Guardian ad Litem ("GAL") testified that "there's been real tension and odds between [Mother] and [A.B.] at times not just based on [A.B.'s] negative behavior." Tr., Vol. 3, p. 97. Weber further stated she felt A.B. "would continue to struggle greatly if she [were] returned to her mom's care." Id.
Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. In re R.S., 774 N.E.2d 927, 930 (Ind.Ct.App.2002), trans. denied (2003). The trial court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. Id. Based on the foregoing, we conclude that the trial court's finding that continuation of the parent-child relationship poses a threat to A.B.'s well being is supported by clear and convincing evidence.[3]

B. Best Interests of the Child
Next, we turn to Mother's allegation the ACDCS failed to prove by clear and convincing evidence that termination of the parent-child relationship is in A.B.'s best interests.
We are mindful that in determining what is in the best interests of the child, the court is required to look beyond the factors identified by the Department of Child Services and look to the totality of the evidence. McBride v. Monroe County *168 Office of Family & Children, 798 N.E.2d 185, 203 (Ind.Ct.App.2003). In so doing, the trial court must subordinate the interests of the parent to those of the children. Id.
In determining that termination of Mother's parental rights is in A.B.'s best interests, the trial court made the following pertinent findings:
5. Termination of parental rights is in the best interests of the child, [A.B.], in that the mother, [D awn B.], the alleged father, [Steve C.] and the unknown father have shown over the course of the related CHINS cause, and in the fact of a treatment plan or plans, and numerous specific services made available and/or provided, that said parents continue to be unable, refuse, or neglect to provide for the basic necessities of a suitable home for the raising of said child.
Evidence presented at the Termination Hearing revealed that the [ACDCS] has had involvement with the family since 2001 when the [ACDCS] attempted to provide services through a Service Referral Agreement. However, the family did not benefit from services provided and a CHINS Petition was ultimately authorized and filed in 2002.
Additionally, evidence presented at the Termination Hearing revealed that the [ACDCS] has made referrals for various services for the mother, but that the mother has failed to benefit from services provided. Evidence presented at trial revealed that the mother has not begun participating in counseling which would have helped her to address her own psychological issues which issues are interfering with her ability to parent the child. Evidence presented at trial revealed that the mother has been diagnosed with depression and that her psychological evaluation revealed that she feels overwhelmed by her depression and stress and that she has difficulty dealing with her frustration. The evaluator testified that a person who is under such a level of stress can have difficulty parenting a difficult child like [A.B.]. Evidence of the mother's inability to manage her stress and to parent the child is found in the testimony of one of the child's Crossroads therapists who testified that at one point during the CHINS proceedings, the child had been returned to the mother's home but that the child had to be removed from the mother's home three months later because of the mother's inability to care for the child. The therapist testified that at the time of the removal of the child from the home in January of 2004, the mother was lying on the floor crying and begging the [ACDCS] to remove the child from her home because she could not take her behavior anymore.
Evidence presented at trial revealed that since the removal of the child from her home, the child has made progress in treatment and therapy and that her behavior is stabilizing. At trial, the Guardian ad [L]item testified to her concern that the progress made by the child would be jeopardized if the child were to be returned to the mother's home. Evidence presented at trial revealed that a family is interested in adopting the child should parental rights be terminated
. . . .
Accordingly, the Magistrate finds that the [ACDCS] has proven by clear and convincing evidence that termination *169 of parental rights is in the child's best interests. . . .
Appellant's App. at 389-91.
These findings are supported by the evidence. The record reveals that at the time of the termination hearing, A.B. had been released from residential treatment and had been placed in therapeutic foster care, where, during the nine previous months, she had been making tremendous progress and was attending all-day public school. Therapist Schultz testified that A.B.'s attendance in all-day public school "speaks volumes" for A.B.'s progress in foster care. Tr., Vol. 1, p. 43.
Case Manager Howard testified the ACDCS was seeking termination of Mother's parental rights because A.B. was in need of "a permanent place" and a "family that will be able to take care of her special needs . . . on a permanent basis, for the rest of her childhood." Tr. Vol. 3, p. 29. Howard also testified, "[T]he [ACDCS] along with numerous providers have provided [A.B.] and [Mother] with therapy, case management, visitations, medical treatments for [A.B.] . . . psychologicals (sic) for [Mother] and none of those have gotten us even any where (sic) closer to [reunification.]" Id. at 48. Similarly, the GAL testified the ACDCS's proposal to terminate Mother's parental rights would be in A.B.'s best interests for "lots of reasons." Id. at 96. In so doing, the GAL stated:
I believe first of all, your Honor, that [Mother] does love her daughter, I wholly believe that. . . . [M]y concern is that she can't provide for this young child. . . . [Mother] has her own issues that she's aware of and I'm thrilled that she's consistently taking her medicine to deal with her depression issues, the problem is that without participating with her own individual counseling it's interfering with her relationship with her child and interfering in what we're trying to do with the reunification process. . . . We all know that [A.B.] is a very special needs child. . . . Mom needs to be a real aggressive kind of parent that provides for limits and structure and consistency and she's not great at doing that. . . . I think that [A.B.] would continue to struggle greatly if she was returned to her mom's care. She's made steady progress, hum, she's not the average child at this point in time. I'm hoping that we'll be able to help her get to that point. I don't know what will happen for her future, but I think unfortunately the best opportunity and the best chance that she has for that is if we terminate parental rights and let her be adopted by people that can provide some of the structure and some of the consistency that she needs. It's been difficult, I'll be honest, I think we've all wavered about what way to take this case and that's why we continued the termination trial in the past because we were hoping at that time some progress had been made in some of the family counseling. . . . We've tried to do all kinds of different things to remedy some of the tension and some of the problems and we just haven't been able to do that. I don't know that [any more] time will give us the ability to do that. This kid needs to know where she's going to be a year from now and if we keep going down the path that we've been going for the last four and a half, five, six years we're not going to be able to give her that consistency, that stability and that permanency. . . . I can't say that if we continue . . . and we do more family therapy and we do more individual counseling that we'll ever get this child to the point that she can be returned to her mother's home and that's not fair to her.
*170 Id. at 96-99. Additionally, we observe that by the time of the termination hearing, Mother was recently unemployed and was still not participating in individual counseling.
We have previously held that a court may consider a parent's response to and benefit from services offered by the Department of Child Services in determining the probability of future detrimental behavior. K.S., 750 N.E.2d at 837. Likewise, the recommendations of a child's caseworker and GAL that parental rights should be terminated support a finding that termination is in the child's best interests. McBride, 798 N.E.2d at 203 (citing In re T.F., 743 N.E.2d 766, 776 (Ind.Ct. App.2001), trans. denied). Based on the totality of the evidence, we conclude that the trial court's determination that termination was in A.B.'s best interests is supported by clear and convincing evidence. See McBride, 798 N.E.2d at 203 (concluding that clear and convincing evidence supported the trial court's termination of parental rights where children were thriving in their current foster home and where the children's caseworker and court appointed special advocate testified as to the children's need for permanency). Mother has failed to comply with and benefit from a number of dispositional goals put into place during the CHINS proceedings. While Mother may have a sincere desire to be reunited with her daughter, she has been unable and unwilling to provide A.B. with a safe and stable home environment. The judgment of the trial court is therefore affirmed.
Affirmed.
BARNES, J., and BRADFORD, J., concur.
NOTES
[1] Steven C. ("Father") is the alleged father of A.B. The trial court terminated Father's (and alleged unknown father's) parental rights to A.B. on August 21, 2007. Father is not a party to this appeal.
[2] We leave unanswered, perhaps for the Legislature or Department of Child Services, the question of how the State will provide long-term care for a child in need of services where, under the statute, parental rights may not be terminated, but where the parents, through no fault of their own, are unable and permanently incapable of becoming able to care for their special needs child.
[3] Having concluded the trial court's finding that continuation of the parent-child relationship poses a threat to A.B.'s well being is supported by clear and convincing evidence, we need not consider whether the ACDCS proved by clear and convincing evidence that the conditions requiring removal would not be remedied.