Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT B.L.:

**KIMBERLY JACKSON**
Indianapolis, Indiana

ATTORNEY FOR APPELLANT D.L.:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**ELLEN N. MARTIN**
Bloomfield, Indiana

**ROBERT J. HENKE**
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF F.L. AND B.L., MINOR CHILDREN, AND THEIR MOTHER, B.L., AND THEIR FATHER, DL. | ) ) ) ) ) | |
| B.L. and D.L. | ) ) | |
| Appellants-Respondents, | ) ) | No. 28A01-1303-JT-126 |
| vs. | ) ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE GREEN CIRCUIT COURT
The Honorable Erik C. Allen, Judge
Cause Nos. 28C01-1209-JT-3, 28C01-1209-JT-4, 28C01-1209-JT-5, 28C01-1209-JT-6

**September 20, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

B.L.'s ("Mother") and D.L.'s ("Father") parental rights to their children, F.L. and B.L. were terminated by the Greene Circuit Court. Mother appeals only the termination of her parental rights to F.L., but Father appeals the termination of his parental rights to both children. Both Mother and Father argue that termination of their parental rights was not supported by the evidence and/or in the best interests of the children.

We affirm.

**Facts and Procedural History**

Mother and Father have two children: F.L. born in 1999 and B.L. born in 2002. During their marriage, Mother and Father engaged in sexual activity with other individuals in their home. In fact, Father would drive Mother to meet men she met on-line for the purpose of engaging in sexual activity. Mother was sometimes paid for the sexual encounters. The children were often present in the family's home during these encounters and would also travel with Father when he provided transportation for Mother to meet other men.

On or about June 17, 2011, when B.L. was eight years old, Mother took both children to a neighbor's home. Father suspected that the neighbor was capable of molesting his children, particularly his son, B.L., but did not prevent Mother from taking them with her. While at the neighbor's home late that night, Mother allowed the neighbor, who had been drinking alcohol, to take B.L. on an ATV ride.

After they returned home, B.L. informed Mother that he had been molested by the neighbor during the ATV ride. Mother eventually reported the incident to the police and also confessed that she had molested B.L. by performing oral sex on him in 2009.

2

Mother informed law enforcement that she had been chatting with a man on the family computer in B.L.'s bedroom and had performed oral sex on her son at the man's urging. Mother told Father about the molestation shortly after it occurred, but Father did not report the incident to law enforcement and claimed that he did not believe Mother's statement that she had molested their son. Mother alleged that Father urged her to molest B.L. in the months leading up to the incident and that Father wanted to observe the molestation.

On June 22, 2011, the children were removed from Mother and Father's home and placed in emergency foster care. The next day the Indiana Department of Child Services of Greene County ("the DCS") filed a petition alleging that the children were in need of services ("CHINS"), and the children were found to be CHINS on August 15, 2011.

After her confession, Mother was charged with Class A felony child molesting. On July 24, 2012, Mother pleaded guilty to Class B felony child molesting, and was ordered to serve ten years in the Department of Correction, with two years suspended to probation. As a matter of law, by virtue of her conviction, Mother is a credit-restricted felon and her earliest possible release date is in April 2018. Father also filed for divorce from Mother in 2012, and the parties' marriage has been dissolved.

Numerous services were ordered for both Father and Mother. Father was permitted to have supervised visitation with both children, but Mother was only permitted to have supervised visitation with F.L. A no-contact order was entered barring any contact between Mother and B.L. until she completes her term of incarceration and probation. F.L. visited with Mother in prison until F.L. requested that the visits end in

3

the spring of 2012. Mother received minimal services in prison. She participated in sex offender classes and enrolled in parenting classes. While in prison, Mother has been taking medication for her bipolar disorder.

Father also participated in all services ordered by the trial court, including therapy, and supervised and unsupervised visitation with the children. Father's service providers noted his active participation in classes and therapy, but all providers expressed concerns about reunifying Father and the children. See generally Appellant Mother's App. pp. 8-11.[1]

Although Father actively participated in services, he was not able to "consistently implement" or "process" the information discussed during those services, particularly with regard to F.L. Father's ability to parent his children simply did not improve. While participating in the services, Father was diagnosed with schizoid personality disorder, "which he displays in part by social isolation, being passive, and placing blame with others." Id. at 8. Father lacked interest in addressing and treating his disorder. Father refused to take responsibility for his own acts that led to removal of the children and placed blame on others. Father also did not display appropriate boundaries with his children or with the service providers involved in this case.

Therapist Joni Reagan, who specializes in addiction, performed a psycho-sexual assessment on Father. Ms. Reagan concluded that Father:

> has a poor ability to form supportive relationships; he misunderstands and misinterprets social cues; he is easily taken advantage of; he is very self

---

[1] The trial court's order terminating both Mother's and Father's parental rights is reproduced in both parties' appendices.

4

focused; he sees himself as a victim and is not accountable; he is not able to take responsibility for his role in the harm caused to the children; it is difficult to change personality disorders and takes years of concerted effort and there was no progress made in treating the father's personality disorder, and this would make it difficult for him to effectively parent the children, and he is likely to allow the children to get away with stuff; although father knew the material he was not able to put it into practice; [F.L.] had assumed the role of wife by taking on the responsibility to care for the father; the father is vulnerable to molest the children because they are essentially his only human contact; the kids would be susceptible to taking on father's disorder; the father doesn't recognize how his issues effect the kids[.]

Id. at 9-10. Ms. Reagan believes that Father will likely become a sex offender without continued treatment and that he could be convinced to molest his own children. Also, Father's ability to meet the children's needs is inconsistent with his schizoid personality disorder and the behaviors he has displayed to service providers.

Dr. Julia Friend, a licensed psychologist, agreed with Father's schizoid personality disorder diagnosis and stated that the disorder is difficult to treat without committing to long-term therapy. Dr. Friend observed Father fail to follow the safety plan when he allowed F.L. to sit on his lap in the waiting area of her office. Dr. Friend also noted that F.L. lacks appropriate boundaries and has displayed inappropriate behavior, behavior that Dr. Friend believes is learned behavior. Dr. Friend also believes that F.L. likely suffers from some undisclosed trauma. Dr. Friend also observed that B.L. has "no idea of acceptable sexual boundaries" and that he will need appropriate guidance from adults. Id. at 10. Dr. Friend opined that "both children will need long-term therapy, structure, and appropriate emotional support and . . . does not believe the father is able to meet these needs of the children due to his lack of progress with his own issues." Id.

5

The court appointed special advocate ("CASA") and family case manager also agreed that termination of parental rights was in the children's best interests. The CASA observed interaction between F.L. and Father that seemed too intimate. The family case manager believes that Father is focused on his own needs instead of his children's needs and has not been able to implement what he was taught from his service providers. Also, the family case manager received several messages from Father indicating plans to kill or harm himself. She believes that Father has shown "instability in his thought processes, which is further evidence of his inability to properly parent" the children. Id. at 11.

While in foster care, the children have been observed engaging in sexualized behaviors with each other and with other children. They have engaged in predatory behavior with smaller children, and B.L. speaks openly about the molestation he suffered from both Mother and their neighbor. While in foster care, B.L. has also exposed himself to others. F.L. openly touches herself sexually while on the couch watching television. As a result, many service providers believe that the children have not disclosed everything they saw or experienced while they resided in the family's home.

Both children are in therapy. F.L. has been diagnosed with post-traumatic stress disorder. F.L. disclosed to her therapist that she did not understand that exposing B.L. to sexual behavior was inappropriate. B.L. equates sexual behaviors with playing a game. His diagnosis is sexual abuse of a child and hyperactivity disorder.

Both children are at risk because they have difficulty distinguishing between those situations that are safe and those that put them at risk. They also show signs of being easily manipulated. The children require long-term therapy and a structured, stable

environment. Both children have made improvements in their current foster placement and appear to be happier and less stressed.

Due to Mother's incarceration and Father's lack of progress with the DCS provided services, on September 26, 2012, the DCS filed petitions to terminate Mother's and Father's parental rights. A three-day fact finding hearing commenced on January 9, 2013. At the hearing, all service providers agreed that it was in the children's best interests to terminate both Mother's and Father's parental rights. Mother also testified that Father was not capable of properly parenting the children and asked that his rights be terminated.

On February 21, 2013, the trial court issued orders terminating Mother's and Father's parental rights. The trial court concluded that termination was in the children's best interests and the children "need permanency now, in a safe, stable and emotionally supportive home, and neither parent is able to currently provide this, nor will they be able to in any reasonable time." Id. at 11. Both Mother and Father now appeal.

**Standard of Review**

When we review a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re P.P., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

7

Here, in terminating Mother's and Father's parental rights, the trial court entered specific factual findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

**Discussion and Decision**

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. In the Matter of Termination of the Parent Child Relationship of K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

8

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B) – (D). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Bester, 839 N.E.2d at 148. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. Id. Finally, "if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship." Ind. Code § 31–35–2–8(a) (emphasis added).

### I. Threat to the Well-Being of the Child

Mother argues that the DCS failed to present evidence to prove that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. Although Mother acknowledges that her molestation of

B.L. "had a negative impact on F.L.[,] . . .", she suggests that there is no evidence that "continued contact between Mother and F.L. would threaten F.L.'s well-being." Mother's Appellant's Br. at 11-12.[2]

To determine whether the continuation of the parent-child relationship poses a threat to the child's well-being, the trial court need not wait until the child is irreversibly influenced by a deficient lifestyle before terminating the relationship. In re E.S., 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Instead, "[w]hen the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." Id.

Mother asserts that the evidence at the termination hearing established that she cooperated with DCS service providers. Also during Mother's visits with F.L., she "had a routine of positive enforcement and showing verbal affection for" F.L. Tr. p. 196. Because Mother was incarcerated during these visits, she had to "work with [F.L.] to get [F.L.] to interact with her." Id. F.L. was uncomfortable visiting with Mother in the prison setting, and therefore, the visitation ceased at F.L.'s request.

Mother also speculates that due to F.L.'s age and her status as an "at risk" child, an adoptive home may not be found. Mother therefore concludes that although she "improperly exposed F.L. to circumstances a child should not face, Mother is stable and

---

[2] Because the DCS was required to prove only one of the factors listed in Indiana Code section 31-35-2-4(b)(2)(B), we do not address Mother's argument that DCS did not present clear and convincing evidence the conditions that resulted in the children's removal or the reasons for placement outside of the parents['] home will not be remedied. Also we note that Father does not challenge the trial court's conclusion that there "is a reasonable probability that: 1) the conditions that resulted in the children's removal or the reasons for placement outside of the parents['] home will not be remedied, and/or 2) continuation of the parent-child relationship poses a threat to the well-being of the children." Appellant Father's App. p. 2

able to exercise a positive influence in F.L.'s life when F.L. needs positive influence." Mother's Appellant's Br. at 19. Mother asserts that allowing her to do so will not threaten F.L. Id.

However, F.L. does not desire to have a relationship with Mother while she remains incarcerated for molesting B.L. Mother acknowledges the trauma her past actions have caused to F.L., and on the record before us, the DCS proved that F.L. is still suffering from that trauma. Importantly, many of the family's service providers believe that the children have not disclosed everything they have seen and/or experienced that have caused them trauma. Since removal from their parents' home, the children have been observed engaging in sexualized behaviors. F.L. exhibits symptoms consistent with exposure to sexual behaviors and possible molestation. F.L. has also been diagnosed with post-traumatic stress disorder, and the evidence suggests that continued contact with Mother, which F.L. does not desire, would continue to cause F.L. emotional and mental harm.

All service providers agreed that F.L. needs permanency now, in a safe, stable and emotionally supportive home. Moreover, F.L. will be nineteen years old before Mother's earliest possible release date. For all of these reasons, we conclude that the DCS proved that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to F.L.'s mental and emotional well-being.

## II. Best Interests of the Children

The trial court determined that termination of Mother's and Father's parental rights was in the children's best interests. In determining what is in the best interests of a

11

child, the trial court is required to look at the totality of the evidence. A.F. v. Marion County Office of Family & Children, 762 N.E.2d 1244, 1253 (Ind. Ct. App. 2002), trans. denied. And the trial court must subordinate the interests of the parents to those of the child involved. Id. A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the child. Lang v. Starke County OFC, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), trans. denied. Also, "the recommendations of a child's caseworker and [guardian ad litem] that parental rights should be terminated support a finding that termination is in the child's best interests." In re A.B., 887 N.E.2d 158, 170 (Ind. Ct. App. 2008).

A. *Mother's Argument*

Mother challenges the trial court's determination that termination of her parental rights was in F.L.'s best interests. Mother argues that she is "reformed" and her complete removal from F.L.'s life "would be yet another loss to a child who already has experienced too much difficulty in her life."

Mother's self-serving argument that she is reformed is simply a request for our court to reweigh the evidence, which we will not do. Mother's own actions caused much, if not all, of the difficulty that F.L. has experienced in her life. And as a result, F.L. chose to end her visits with Mother while Mother remains incarcerated. F.L. has not expressed any interest in maintaining a relationship with Mother. Moreover, due to her incarceration and her earliest possible release date, Mother will never be able to "parent"

12

F.L. or provide a suitable environment for her.  See e.g. Lang, 861 N.E.2d at 373.  For these reasons, termination of Mother's parental rights is in F.L.'s best interests.

B. *Father's Argument*

To support his argument that termination of his parental rights was not in the children's best interests, Father stresses that he cooperated and participated in all services provided by DCS.  He also argues that the DCS's goal changed from reunification to termination solely because of Father's statement that he is easily manipulated.  Specifically, Father told Green County Sherriff's Deputy James O'Malley that during the marriage, if Mother badgered him enough, he "could pretty much be talked into doing anything."  Tr. p. 292.  Father also notes the children's desire to be returned to him.

All service providers testified that termination of Father's parental rights was in the children's best interests.  They noted that although Father participated in services and cooperated with DCS, he failed to improve his parenting skills and made little progress in addressing his personality disorder.  Importantly, Father demonstrated little interest in changing and improving his ability to parent his children.

The children's therapist classified the children as "at risk" because they are easily manipulated and struggled with discerning which situations would put them at risk of harm.  The children require a stable environment with structure, which Father is not able to provide.  Further, Father is not able to manage the children's behavioral issues.

For example, Father acknowledged that F.L. treats him like a boyfriend instead of a father and admits that he has trouble controlling her behavior.  Despite his acknowledgment of the issue, Father was observed allowing F.L. to sit on his lap in the

13

lobby of a service provider's office. Sandy May, the child appointed special advocate, also observed that F.L.'s interaction with Father seemed too intimate.

Father also struggles with accountability and continues to blame the children's removal on Mother and their neighbor. But Father knew about both molestations and did not report them or seek help for B.L. And from the evidence presented, it is reasonable to assume that Father could be persuaded to allow the children to be harmed or if they were harmed, he would not assist the children. For all of these reasons, we conclude that termination of Father's parental rights is in the children's best interests.

### III. Satisfactory Plan for Care and Treatment

Both parents challenge the trial court's conclusion that there is a satisfactory plan for care and treatment of the children. The children are currently residing in a stable foster home and the DCS is attempting to find suitable parents to adopt the children. Although the children's current foster family does not intend to adopt them, they are attached to the children and willing to keep them "as long as needed." Tr. p. 453. The foster parents understand the children's need for stability and "are willing to be there to provide that." Id. at 454.

A satisfactory plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." In re D.D., 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), trans. denied. Furthermore, "[a]ttempting to find suitable parents to adopt the chil[d] is clearly a satisfactory plan." Lang, 861 N.E.2d at 375. Therefore, the court did not commit clear error in concluding that adoption, although not underway, was a satisfactory plan for the children.

14

**Conclusion**

The DCS established by clear and convincing evidence the requisite elements to support the termination of Mother's and Father's parental rights. We therefore affirm the trial court's judgment.

Affirmed.

NAJAM, J., and BROWN, J., concur.