## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 23 2020, 10:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: E.N. (Minor Child), <br><br> and <br><br> M.N. (Father), <br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br> *Appellee-Petitioner.* | January 23, 2020 <br><br> Court of Appeals Case No. 19A-JT-1888 <br><br> Appeal from the Montgomery Superior Court <br><br> The Honorable Heather Barajas, Judge <br><br> Trial Court Cause No. 54D01-1901-JT-18 |

**Tavitas, Judge.**

## Case Summary

M.N. ("Father") appeals the termination of his parental rights to E.N. (the "Child").  We affirm.

## Issue

Father raises one issue, which we restate as whether there was sufficient evidence that termination of the parent-child relationship was in the Child's best interests.

## Facts

Father and J.N. ("Mother")[1] are parents of the Child, born in November 2007, and the Child's sibling, who is now an adult.[2]  On January 23, 2018, police arrested Mother and Father at their home for Count I, dealing in methamphetamine, a Level 2 felony; Count II, possession of methamphetamine, a Level 3 felony; Count III, possession of a narcotic drug, a Level 5 felony; Count IV, maintaining a common nuisance, a Level 6 felony; Count V, possession of a controlled substance, a Level 6 felony; and Count VI, neglect of a dependent, a Level 5 felony.  The Child was at home at the time of

---

[1] Mother filed a Notice of Appeal on August 12, 2019; however, Mother filed a motion to dismiss her appeal, which this Court granted on October 4, 2019.  This decision, therefore, will focus only on facts as they relate to Father.

[2] The Child's sibling became an adult prior to the fact finding hearing.  This decision, therefore, will focus only on facts as they relate to the Child.

her parents' arrest; the Child was removed on an emergency basis and placed with maternal grandparents.

[4] On January 24, 2018, DCS filed a petition that the Child was a child in need of services ("CHINS"). The Child was adjudicated a CHINS on March 28, 2018, and placement remained with maternal grandparents. The trial court entered a dispositional order on April 25, 2018, which required Father to: (1) maintain contact with DCS; (2) participate in services recommended by DCS; (3) maintain suitable income; (4) maintain a safe and stable home; (4) abstain from consuming or possessing illegal substances; and (5) attend scheduled visitations[3] with the Child.

[5] Marie Laston, the DCS family case manager ("FCM"), supervised these visits and began working with Father on appropriate services. FCM Laston supervised a total of seven visits. At one of the early visits, Father was "upset" and "didn't understand why he couldn't talk about the case with the [C]hild"; Father was an hour and sixteen minutes late to one session; one session was cancelled due to both parents appearing late; and during one session, Father remained in the car and told FCM Laston that "he was having a tough time and it was really hard," before he went inside to visit with the Child. Tr. Vol. II p. 100.

---

[3] Initially, Father was prohibited from seeing the Child due to the criminal charges. Eventually, the plan changed to allow one supervised two-hour visit per week with the Child.

[6]     DCS referred Father to Cummins Behavioral Health ("Cummins") for an intake assessment. Father's assessment was scheduled for February 27, 2018; however, Father did not attend his appointment. On April 11, 2018, Father participated in his intake assessment; Father was then referred to intensive outpatient therapy ("IOT"), addictions counseling, skills training, drug screens, and case management. Father only attended nine of the twenty-four sessions for IOT between April 24, 2018, and June 24, 2018; Father never attended addictions counseling and did not begin the skills training due to his lack of participation in IOT. An employee at Cummins attempted to contact Father to re-engage Father in services; however, Father never returned the phone call. Father was discharged from Cummins on July 2, 2018, due to his noncompliance.

[7]     Between January 30, 2018, and June 12, 2018, Father participated in drug screens fifteen times, ten of which were positive for methamphetamine. On June 14, 2018, DCS filed a motion to suspend the parents' parenting time due to parents' noncompliance. The motion alleged, relevant to Father, that Father: (1) tested positive for methamphetamine three times in April and twice in May; (2) could not be reached in March by FCM Laston; (3) failed to appear at an April drug screen; (4) only attended five of the eighteen requested IOT classes as of May 2018; and (5) refused to participate in drug screens in May 2018. The trial court temporarily suspended parenting time on June 15, 2018.

[8]     In August 2018, Father went to an intake assessment at Sycamore Springs inpatient treatment facility after FCM Laston miscommunicated information to

Father regarding the treatment facility at which Father was to appear. Father went to the program in Lafayette, when instead, he was to appear at the location in Jeffersonville. Still, Father went through with the assessment at Sycamore Springs, but Father was dismissed from Sycamore Springs after the staff determined that another program would be more appropriate for Father.[4] Father ultimately made an appointment at another inpatient treatment facility, but never followed through and did not attend his appointment. On September 4, 2018, Mother was charged with Count I, possession of methamphetamine, a Level 6 felony; and Count II, trafficking with an inmate, a Level 5 felony.

[9] On December 10, 2018, the Child's permanency plan changed to adoption. At that time, DCS's communication with Father had been "poor," and Father had not attended the referred treatment programs as of August 2018. Tr. Vol. II p. 87. Father also received services through Redwood Toxicology[5] where Father completed his drug screens; Father missed nineteen screens, and Father was suspended on three separate occasions due to noncompliance.[6]

[10] Sometime in December 2018, Father again informed FCM Laston that he wanted to participate in inpatient services; FCM Laston referred Father to a

---

[4] Specifically, the Sycamore Springs staff thought that IOP, an outpatient program, would be better for Father.

[5] FCM Laston implemented the services of Redwood Toxicology because "sometimes there were car issues, things of that nature, [Redwood] was to alleviate those problems to where Redwood would come to their residence to be screened." Tr. Vol. II p. 88.

[6] The timing of these missed drug screens is somewhat unclear from the record; however, it appears to have occurred between June and December 2018.

detox program prior to inpatient services. Father ultimately failed to attend the program and claimed that "he had advised one of the times he was trying to prevent the electricity from his household getting shut off. On another occasion he said that his dog was dying so he couldn't go. . . ." Tr. Vol. II p. 89.

[11] On January 22, 2019, DCS filed a petition to terminate Mother's and Father's parental rights. On May 17, 2019, the trial court granted DCS's petition to relieve DCS of providing further services to Mother and Father during the pendency of the termination proceedings.

[12] The trial court held a fact finding hearing on April 4, 2019, and June 13, 2019. At the time of the fact finding hearing, Mother's criminal charges from August 2018 were still pending, and Mother had been incarcerated continuously since her arrest. Father had entered into a plea agreement with regard to his January 2018 charges and was facing three to nine years at the time of the fact finding hearing; Father's sentencing hearing was set for June 24, 2019. Also, at the time of the fact finding hearing, Father was unemployed, and Father's house was being foreclosed.

[13] Father testified that he would consent to a guardianship by maternal grandparents. Father, however, failed to sign[7] a consent to guardianship, and the maternal grandparents had not filed a petition for guardianship. No

---

[7] It does not appear from the record that Father was ever presented a consent to sign.

evidence was presented regarding why grandparents did not file a petition for guardianship.

[14] FCM Laston asked the trial court to terminate Father's parental rights due to the pending criminal charges, upcoming likely incarceration, and Father's noncompliance with services. FCM Laston testified that, in September or October 2018, she had a conversation with maternal grandparents about guardianship, and they were "open to either" adoption or guardianship. *Id.* at 102. FCM Laston also testified that DCS had a "concern" with guardianship because it is "dissolvable," and DCS feared that, after Father and Mother served their sentences, but without completing drug treatment, Father and Mother could "get [the Child] back through a guardianship [and the Child] could go through the same trauma again." Tr. Vol. II p. 92. Instead, FCM Laston testified that DCS desired the Child have stability in her life and that, in her opinion, termination of Mother's and Father's parental rights was in the Child's best interests. After some questioning from the trial court, however, FCM Laston could not answer how adoption would be better than guardianship for the Child.

[15] Melissa Brush, the court appointed special advocate ("CASA"), testified that guardianship or adoption would be in the best interests of the Child; and that, although she was aware the maternal grandparents are willing to adopt, she is uncertain if they are willing to establish guardianship over the Child. Stephanie Rose, a psychologist with Valley Oaks Health, testified the Child has succeeded

in her placement with maternal grandparents, is on student council at school, and has several friends.

[16]     On August 12, 2019, the trial court entered findings of fact and conclusions thereon terminating Mother's and Father's parental rights.  Relevant to Father's appeal, the trial court's order concluded:

* * * * *

17.  The child has remained in the care of the grandparents since January 2018.

18.  The child worries about her parents but does not really discuss them.

19.  There has been no improvement and no progress in Mother or Father's condition from the time the child was removed to the date of the fact-finding hearing in the instant matter.  Based on their history and the evidence, no progress is expected in the foreseeable future.

20.  Father has no income or means to support the child or himself.

21.  Mother and Father have shown little interest in this child's needs.  They have made zero progress towards addressing the issues which gave rise to the CHINS matter and this subsequent case.  The child is in a stable, loving home and is thriving there.

22.  DCS has proven by clear and convincing evidence that termination is in the Child's best interest pursuant to Ind. Code § 31-35-2-4(C).

23. DCS has proven by clear and convincing evidence that there is a satisfactory plan for the care and treatment of the child pursuant to Ind. Code § 31-35-2-4(D) if termination is granted, and that plan is adoption.

24. The CHINS Court ordered adoption as the Permanency Plan.

25. There was never a request for Guardianship as [a] permanency plan during the CHINS, nor was a petition ever filed.

* * * * *

Appellant's App. Vol. II pp. 64-65. Father now appeals.

## Analysis

[17] Father appeals the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's best interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by

failing to provide for the child's immediate and long-term needs.'" *In re K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[18] Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[8] Here, the trial court did enter findings of fact and conclusions thereon in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

---

[8] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

    (a)  Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

    (b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

[19] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (A) That one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii) The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> >
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child.
>
> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal

or the reasons for placement outside the
home of the parents will not be remedied.

 (ii) There is a reasonable probability that the
continuation of the parent-child relationship
poses a threat to the well-being of the child.

 (iii) The child has, on two (2) separate occasions,
been adjudicated a child in need of services;

 (C) that termination is in the best interests of the child;
and

 (D) that there is a satisfactory plan for the care and
treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

[20] Father's specific argument is that DCS failed to prove by clear and convincing evidence that termination of the parent-child relationship was in the Child's best interests because guardianship was an alternative that the trial court could have chosen instead of termination. Father, however, failed to present evidence regarding the willingness or efforts of maternal grandparents to file a petition to establish guardianship.

[21] In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *See In re A.B.,* 887 N.E.2d 158, 167-68 (Ind. Ct. App. 2008). In doing so, the trial court must subordinate the interests

of the parents to those of the child involved. *Id.* at 168. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

[22]     The uncontested findings demonstrate that Father failed to participate in many services; Father had many positive or missed drug screens; and Father was awaiting sentencing for a crime that involved illegal substances in the home where the Child was present. Father was facing several years of incarceration. Father, in his brief, argues that the maternal grandparents were willing to serve as guardians for the Child. The evidence to support this statement came from FCM Laston's testimony where she indicated that, in September or October 2018, maternal grandparents were "open to either" adoption or guardianship. Tr. Vol. II p. 102. On the other hand, testimony from the CASA demonstrated uncertainty that grandparents were willing to be the Child's guardians, instead of proceeding with adoption. Father identified no evidence in the record that at the time of the termination fact finding hearing on April 4, 2019, and June 13, 2019, that grandparents had filed or were willing to file a petition for guardianship.

[23]     Here, the trial court considered the potential for guardianship, but concluded that the maternal grandparents had not filed a petition for guardianship, and the

CHINS court found that adoption would be the permanency plan for the Child. Regardless, the mere fact that a guardianship may have been available does not entitle Father to relief. Based on the evidence in the record, we cannot say the trial court's decision is clearly erroneous.

## Conclusion

[24] DCS presented sufficient evidence that termination was in the best interests of the Child. We affirm.

[25] Affirmed.

Najam, J., and Vaidik, J., concur.