**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 30 2014, 7:31 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ANTHONY M. ROSE**
Anthony Rose Law Firm
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF ) 
THE PARENT-CHILD RELATIONSHIP OF: ) 
O.V., Minor Child, ) 
 ) 
J.V., Mother, ) 
 ) 
    Appellant-Respondent, ) 
 ) 
        vs. )    No. 71A03-1312-JT-499 
 ) 
INDIANA DEPARTMENT OF CHILD ) 
SERVICES, ) 
 ) 
    Appellee-Petitioner. ) 

APPEAL FROM THE ST. JOSEPH PROBATE COURT
The Honorable James N. Fox, Judge
The Honorable Graham C. Polando, Magistrate
Cause No. 71J01-1303-JT-20

**May 30, 2014**

**BROWN, Judge**

J.V. ("Mother") appeals the involuntary termination of her parental rights to her child, O.V. Mother raises two issues which we revise and restate as:

I.      Whether the trial court erred in allowing the admission of the CASA report as evidence; and

II.     Whether the evidence was sufficient to support the termination of Mother's parental rights.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother used alcohol or cocaine while she was pregnant with O.V., and on October 4, 2011, Mother gave birth to O.V. On October 6, 2011, the Department of Child Services ("DCS") received a report that Mother was not understanding nor carrying through with demonstrating appropriate feeding care for her newborn son. The report also stated that there were concerns for O.V.'s safety due to Mother's disconnect and lack of bonding. O.V. was removed from Mother due to the fear of Mother's inability to feed and care for O.V. and Mother's drug use. On October 7, 2011, the court entered an order authorizing the filing of a child in need of services ("CHINS") petition. On October 11, 2011, the court entered a CHINS Detention Hearing Order.

On November 14, 2011, the court entered a CHINS disposition order and ordered Mother to participate in a parenting evaluation and follow all recommendations, maintain

sobriety and appropriate housing, participate in mental health evaluations, and continue to participate in visitation services with O.V.

O.V. was placed in a foster home two days after he was born and shook horribly for two or three months. O.V.'s foster mother took O.V. to visit Mother twice a week, but "it got too much" for Mother and the visits were reduced to once a week. Transcript at 10. During one of the visits, Renaldo Wilmoth, the family case manager ("FCM"), observed that Mother struggled with holding O.V. and had difficulties with nurturing and feeding him. The visits were suspended because Mother failed to show up for visits and were never resumed because Mother did not become compliant with the drug treatment services.

Mother was ordered to undergo a psychological evaluation and follow all recommendations. She underwent the evaluation and was recommended to complete a dual addiction program that would address her drug and psychological issues. The DCS referred her to a treatment program, but the program rejected her because she was "high risk" in that she told them she was suicidal at the time. Id. at 34. She was referred to Oaklawn for individual counseling, but it "didn't go well," and Mother referred to the people there as "a bunch of idiots." Id. at 35. She was in treatment at another facility at least four different times, and discharged herself the first time without giving a reason, went back to the facility and withdrew a second time, entered the program again in February 2013, but did not complete services, and reported relapsing on more than four occasions.

3

Mother made it very difficult for Wilmoth, the FCM, to have contact with her as Wilmoth attempted to visit her residence at least five different times and was never able to enter any home to see whether Mother's residence was appropriate. Cheri Lynn Nater, the court appointed special advocate ("CASA") for O.V., left multiple messages for Mother, but Mother left Nater only one message in five months, and Nater was unable to contact Mother until one of the hearings. Nater had a chance to meet Mother at a hearing in September, and Mother, through her attorney, retook Nater's phone number and said that Mother wanted to contact her when she collected her thoughts but she did not contact Nater.

Meanwhile, on May 14, 2012, the court ordered Mother to provide Wilmoth with proof of her attendance at AA/NA meetings and the Dual Diagnosis Program. In March 2013, the DCS filed a petition for involuntary termination of Mother's parental rights. On October 29, 2013, the court held a hearing. Wilmoth testified that Mother would not communicate with him over the last year but would communicate directly with his supervisor and that her housing was not stable at any point in the case. Wilmoth testified that the reasons for DCS's involvement had not been remedied because Mother had not completed any substance abuse program nor shown the ability to remain stable as far as living in one place for a set period of time, and her lack of cooperation with the dispositional order showed that she had not been in compliance with the court and the services that were ordered. He also testified that he thought that Mother's continuing relationship with O.V. was a threat to his well-being based upon the following reasons:

> [Mother has] never shown the ability to care for herself over the course of this case. [Mother] has been, in several occasions I've seen her looking

4

very disheveled. Mentally she struggled to communicate with the worker about her own needs as well – as well as the child's needs. I talked to her one time, I believe, about her getting visitation back and letting her know that she had to be in compliance with her drug services in order for us to go back and ask the courts to reinstate those services. I believe that back in December we were on track to get her the visits back, but then she left treatment again after a short period of time citing that she relapsed.

Id. at 43-44. He also testified that he thought that termination of Mother's parental rights was in O.V.'s best interests.

Nater testified that Mother had not done any of the things that DCS set in order for her to have O.V. returned and that termination of Mother's parental rights was in O.V.'s best interests. When asked whether Mother's lack of communication with her figured into her recommendations, Nater answered: "Oh, definitely. I mean, I – if I had a child that I was trying to get back I would do anything I could to get in . . . contact with the people that I needed to." Id. at 60.

The DCS's attorney moved to admit the CASA report, and Mother's attorney objected to the admission of the report based upon hearsay. Mother's attorney stated: "I don't have an objection to the final recommendation and any discussion about her visits with [O.V.] and any – any discussions about attempts to contact [Mother], but – but again the overwhelming majority of the report is . . . based purely upon hearsay." Id. at 56. The court overruled the objection and stated:

Without having seen the report, even though I have access to it, I . . . deliberately did not review it before, excuse me, this hearing. I assume that, like most CASA reports, it does contain a great deal of hearsay. However, it's well settled that the CASA is entitled to present an opinion. I think it's just as well settled that the CASA is entitled to rely on other representations in generating that opinion. And so, the Court will consider the CASA report. I will show the objection overruled. Obviously the specific contentions in that report will be recognized as based on some

5

things that the CASA, perhaps, did not directly witness, but the objection is overruled. I will consider the report.

Id.

Mother testified that she should be moving into an apartment in November, that she started with her counselor on Friday, that she had been with a sponsor through AA for about a week and a half, and that it had been a little over a month since her last relapse. Mother testified that she has "Bi-Polar II" and "minor Tourettes." Id. at 68. When asked why she contacted Wilmoth's supervisor, Mother stated: "I just – I – I'm not really sure on that. I just thought to, I don't know, maybe a woman to woman kind of thing. I'm not really sure, but I just thought to go straight to her, would be the best source at times." Id.

On November 20, 2013, the court terminated Mother's parental rights to O.V. The court's order states in part:

3. Whether the Conditions Causing the Children's Removal or Continued Placement Outside of the Home Would Not Be Remedied:

a. The magistrate finds that "the conditions causing the child's removal" were stated, in a very general fashion, in the Court's order ratifying that removal on October 11, 2011: that "it would be contrary to the welfare of the child to remain in the child's home" and that "continuation in the home would not be in the best interest of the child." (Department's Exhibit A, pages 3-4).

b. More specifically, Department of Child Services Family Case Manager Renaldo Wilmoth credibly testified that the Court originally detained [O.V.] from his Mother because she "was unable to feed and care for" [O.V.], and because of Mother's drug use.

c. The parties disagreed on whether [O.V.] was born positive for cocaine. While that fact would, in and of itself, satisfy the first half of a CHINS determination, see Ind. Code § 31-34-1-10(1)(B), the

6

Department made no such allegation as part of its Petition. Further, the Department's first statutorily-mandated Progress Report noted, "The child [sic] urine test returned negative but the hospital are [sic] waiting on the meconium test to come back." (Department's Exhibit B, p. 20.) However, at the hearing on this matter, [Mother] did concede that she used cocaine and alcohol while pregnant with [O.V.], and the magistrate credits that testimony. Given all of the above, the magistrate is concerned that [Mother] stated that she was "bewildered as to why [O.V.] was taken from me."

d.  The magistrate finds it improbable that [Mother] will be able to remedy those conditions. At the first (three-month) review hearing in this case, the Court found her "not in compliance" with services (Department's Exhibit A, p.15), and was again found not in compliance at the status hearing on September 9, 2012 (Department's Exhibit A, p. 19).

e.  [Mother] finally enrolled in drug treatment on October 11, 2012, over a year after [O.V.] had been removed from her care – and "self-discharged" without completing that treatment. Indeed, [Mother] testified that she "fell back into" drugs because the child was removed. While the magistrate understands and sympathizes with the emotional toll removal exacts on both parent and child, it was [Mother's] responsibility to address the reasons for removal, not embrace them. Indeed, her continued usage makes her later refusal to submit to random drug screens – to which Mr. Wilmoth credibly testified – particularly concerning. [Mother] conceded that she "relapsed a little over a month" before the hearing in this matter, indicating that her drug issues are far from over.

f.  In the two years she had been receiving services, Mother refused to communicate with the Department's caseworkers, speaking only through those caseworkers' supervisor. Indeed, [Mother] referred to the Department's service providers as "a bunch of idiots," which the magistrate finds indicates an unwillingness to accept the services she very clearly needed.

g.  Finally, [Mother] failed to maintain stable housing throughout the time she was receiving services. For the reasons above, then, the magistrate finds that the Department has clearly and convincingly shown that [Mother] will not remedy the conditions that resulted in [O.V.'s] removal.

7

4. Whether Continuing the Mother-Child Relationship Poses a threat to [O.V.'s] Well-Being:

a. Given her admitted substance abuse while pregnant, the magistrate finds that [Mother] posed a threat to [O.V.'s] well-being in utero. Foster Mother . . . credibly testified to the child's stunted development, and Mr. Wilmoth credibly echoed that testimony, noting the disturbing fact that [O.V.] was delayed in crawling.

b. Given [Mother's] inability or unwillingness to address that drug use, as detailed above, the magistrate finds that she continues to pose a threat to [O.V.'s] well-being. Further, the magistrate finds that that threat has continued to manifest itself in other potentially dangerous forms: Mother indicated to Department caseworkers that she was suicidal and lacked stable housing.

c. The magistrate further finds that Mother exhibited a lack of basic parenting skills while visiting with [O.V.]. Mr. Wilmoth credibly testified that Mother "struggled" during such visits, having difficulties "nurturing and feeding the child," feeding him, for example, while he was sitting in his carrier, and struggling even to hold him on her shoulder. (While Mr. Wilmoth testified that Mother was also "nervous" during these visits, the magistrate does not find that nervousness alone, given the awkwardness inherent in such a situation, should lead to any negative conclusions regarding Mother.)

d. Given the above, the magistrate finds that the Department clearly and convincingly established that continuing [Mother's] parental relationship with [O.V.] presents a threat to his well-being.

5. Whether Termination of the Mother-Child relationship is in [O.V.'s] best interests:

a. The magistrate reiterates his findings above. Because the Department has clearly and convincingly shown that terminating the mother-child relationship poses a threat to [O.V.'s] well-being, it follows necessarily that continuing it would not be in his best interests.

b. Further, the CASA, Sheri Nater, credibly testified that termination would be in [O.V.'s] best interest. While not dispositive, such a recommendation is evidence that termination is indeed in the child's best interests. See In re A.B., 887 N.E.2d 158, 169 (Ind. App. 2008).

8

> The magistrate finds that recommendation should bear particular weight here, where the CASA met extensively with [O.V.], and credibly testified that [Mother] failed to make even the minimal effort to keep in contact with her.
>
> c.  The magistrate must note that [Mother's] father ([O.V.'s] grandfather) credibly testified that [Mother] "has a lot of heart." Indeed, [Mother], while testifying, seemed candid and genuinely concerned with [O.V.'s] best interests. Sadly, the magistrate must concur with Mr. Wilmoth, who testified that [Mother] has difficulty caring even for herself, much less this child.

Appellant's Appendix at 9-11.

## DISCUSSION

## I.

Mother argues that the CASA report includes information from hospital records, conclusions of psychiatrists, summaries of substance abuse and mental health treatment records, summary of visitation reports, and other likewise inadmissible hearsay pursuant to Ind. Evidence Rule 802. Mother contends she was deprived of the opportunity to cross-examine hospital staff, the evaluating psychiatrist, substance abuse and mental health treatment providers, and visitation supervisors. She posits that the CASA should not be used as a conduit to present inadmissible hearsay evidence from DCS's case file in termination of parental rights proceedings, and that the CASA relied on the DCS case file to determine that O.V. tested positive for cocaine at birth and for Mother's "Welsh Code" and IQ score. Appellant's Brief at 9. She contends that the admission of such hearsay evidence violates the Fourteenth Amendment of the United States Constitution and Ind. Code § 31-32-2-3.[1]

---

[1] Ind. Code § 31-32-2-3 provides in part:

The DCS argues that Mother objected to the CASA report based only on hearsay grounds and waived any other argument with respect to the report, and that Mother fails to demonstrate any harm because the only reference to the CASA in the termination order is based on her testimony at the hearing and not the CASA report. The DCS also argues that the CASA had a statutory right to file her report and a right to rely on DCS's case file in making her recommendation, and that Mother was able to cross-examine the CASA on both the contents of the CASA report and the basis of her recommendation.

We must disregard "any error or defect in the proceeding which does not affect the substantial rights of the parties." Ind. Trial Rule 61. Further, the erroneous admission of evidence that is merely cumulative of other evidence in the record is not reversible error. In re M.A.S., 815 N.E.2d 216, 222 (Ind. Ct. App. 2004). During the evidentiary hearing, Mother admitted that she used alcohol or cocaine while she was pregnant with O.V. and has "Bi-Polar II" and "minor Tourettes." Transcript at 68. Mother did not dispute that she had some struggles with substance abuse and struggled with substance abuse after O.V.'s birth. She also testified that she relapsed with cocaine since DCS became involved and it had been a little over a month since her last relapse. O.V.'s foster mother testified that the visits with Mother twice a week were too much for Mother, and visits were reduced to once a week and that Mother visited O.V. for about three months. Wilmoth testified that he observed Mother struggle with holding O.V. and had difficulties

---

(b)     A parent, guardian, or custodian is entitled:

    (1)     to cross-examine witnesses;
    (2)     to obtain witnesses or tangible evidence by compulsory process; and
    (3)     to introduce evidence on behalf of the parent, guardian, or custodian.

with nurturing and feeding him. Wilmoth also testified that visits were suspended because Mother failed to show up for visits and they were never resumed because Mother did not become compliant with the drug treatment services. To the extent that Mother argues that the allegation that O.V. tested positive for cocaine at birth appears only in the CASA report, we observe that the court noted that the parties disagreed on whether O.V. tested positive for cocaine at birth and that the DCS made no such allegation as part of its petition. Given the evidence cumulative of the CASA report and the evidence discussed above, we conclude that any error in admitting the CASA report was harmless and did not affect Mother's substantial rights.

## II.

The next issue is whether the evidence is sufficient to support the trial court's judgment terminating Mother's parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied, cert.

11

denied, 534 U.S. 1161, 122 S. Ct. 1197 (2002); see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

   (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

   (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

   (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

12

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)), reh'g denied. "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

Mother appears to argue that the evidence did not support the court's conclusion that the conditions that resulted in O.V.'s removal will not be remedied, that she did not pose a threat, and that termination was in O.V.'s best interests.

A.    Conditions Remedied

Mother argues that "[w]ith a little more time and assistance from DCS, [she] could remedy the reasons for removal and placement, and provide a safe environment for her child." Appellant's Brief at 11. Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the State to establish, by clear and convincing evidence, only one of the three requirements of subparagraph 4(b)(2)(B). Because we find it dispositive, we limit our review to Mother's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether DCS presented clear and convincing evidence establishing that there is a reasonable probability that the conditions leading to the removal and continued placement of O.V. outside Mother's care will not be remedied. In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re N.Q., 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the

13

permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." Id. A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Id. (quoting McBride, 798 N.E.2d at 199). The burden for DCS is to establish "only that there is a reasonable probability that the parent's behavior will not change." Id.

The record reveals that O.V. was removed from Mother's care in October 2011 due to Mother's inability to feed and care for O.V. and Mother's drug use. O.V. shook horribly for two or three months. Mother visited O.V. twice a week before visits were reduced to once a week and ultimately suspended after Mother failed to appear for visits. The DCS referred Mother to Oaklawn for individual counseling, and she referred to the people there as "a bunch of idiots." Transcript at 35. She withdrew from treatment multiple times. The FCM testified that Mother reported relapsing on more than four occasions, and Mother made it very difficult for the FCM to have contact with her. The FCM further testified that the reasons for DCS's involvement had not been remedied because Mother had not completed any substance abuse program nor shown the ability to remain stable as far as living in one place for a set period of time, and that her lack of cooperation with the dispositional order showed that she had not been in compliance with the court and the services that were ordered. The CASA testified that Mother did not

14

perform any of the things that DCS set for her to have O.V. returned. The record reveals that clear and convincing evidence supports the trial court's findings as detailed above and the findings provide ample evidence to support the trial court's conclusion that the conditions resulting in removal will not be remedied.

## B.     Best Interests

We next consider Mother's assertion that DCS failed to prove termination of her parental rights is in O.V.'s best interests. She points to the court's statement that "[b]ecause the Department has clearly and convincingly shown that terminating the mother-child relationship poses a threat to [O.V.'s] well-being, it follows necessarily that continuing it would not be in his best interests." Appellant's Appendix at 11. She argues that because the trial court relied primarily on its conclusion as to a separate element of the termination of parental rights statute, the findings do not support the judgment. She concedes that the same evidence could be used in proving multiple statutory elements but argues that the trial court's conclusory opinion of the best interests element is cause for remand. She also argues that the court erred in giving particular weight to the CASA in that the CASA met five times with a two-year-old child. Mother further asserts that her failure to keep in contact with the CASA has no bearing on O.V.'s best interests.

In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, the

15

recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. A.D.S. v. Ind. Dep't of Child Servs., 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), trans. denied.

Wilmoth, the FCM, and Nater, the CASA, both testified that termination of Mother's parental rights was in O.V.'s best interests. Based upon the recommendations and evidence discussed above and in the record, we conclude that there is sufficient evidence to support the trial court's determination that termination of Mother's parental rights is in O.V.'s best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

## CONCLUSION

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.

16