# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 10 2018, 9:21 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of:

G.L. (Minor Child)

and

C.L. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

October 10, 2018

Court of Appeals Case No.
18A-JT-977

Appeal from the Dearborn Circuit Court

The Honorable James D. Humphrey, Judge

Trial Court Cause No.
15C01-1708-JT-22

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, C.L. (Mother), appeals the trial court's order terminating her parental rights to her minor child, G.L. (Child).

We affirm.

# ISSUE

Mother raises one issue on appeal which we restate as: Whether there was sufficient evidence to support the termination of Mother's parental rights.

# FACTS AND PROCEDURAL HISTORY

On April 2, 2015, the Department of Child Services (DCS) removed Child, who was five years old at the time, and his four-year-old sister (Sister)[1] from Mother's home. On April 6, 2015, DCS filed a petition alleging that Child was a child in need of services (CHINS) because Mother had attempted to voluntarily relinquish custody to a family friend, Child had been reported to be acting out with sexual behaviors, Mother's home had no utilities, Mother had been observed to have decreased mental health over the prior thirty days, Mother had reported terminating her mental health workers because they refused to refill Child's medication, and because Child's arm was bruised in a

---

[1] Mother's parental rights to Sister were terminated in a separate proceeding.

manner consistent with having been grabbed. On July 13, 2015, the trial court entered an order finding all the DCS allegations to be true and declaring Child a CHINS. On August 13, 2015, the trial court entered its Dispositional Order directing Mother to, among other things, establish and maintain contact with the DCS family case manager (FCM), notify the FCM of any change in address, notify the FCM of any criminal arrest or pending criminal charges, and to comply with any recommendations for programs or services made by the FCM. The trial court also ordered Mother to maintain suitable, safe, and stable housing, obey the law, complete and comply with parenting and substance abuse assessments, consistently meet with mental health personnel and comply with any medication orders issued, and to attend all scheduled visitation.

[5] Prior to the underlying CHINS case being initiated, Mother had been prosecuted for neglect of a dependent for an incident wherein then one-and-one-half-year-old Child had been left alone by his caregiver in whose care Mother had left him. From April 6, 2015, until February 22, 2018, Mother was arrested on at least three occasions for offenses including battery with bodily injury, theft, and allowing an unlicensed driver to operate her vehicle. Mother's probation was revoked, and during the pendency of the CHINS and the instant matter, Mother was incarcerated for approximately sixteen months at various times.

[6] When Mother was not incarcerated, she was offered a number of services through DCS, including behavioral therapy and medication management services to address her mental health diagnosis of bi-polar disorder and

depression. Mother's compliance with these services was sporadic. Mother made improvement when she attended her mental health services and took her medication, but she often would not take her medication. Mother did not attend any medication management appointments in 2016 or 2017. Mother did not regularly attend her weekly behavioral therapy, only attending on two or three occasions during the first eighteen months of the CHINS case. Mother did complete psychological testing, which resulted in a recommendation for ongoing therapy and medication. During the pendency of the CHINS proceedings, it was reported that Mother threatened Child's foster parents and a number of caregivers. Mother had also been involved in an incident during one of her periods of incarceration wherein she threatened to remove a pregnant inmate's fetus from her womb and force her to eat it.

[7]     During the CHINS proceedings, Mother was scheduled to have supervised parenting time with Child once a week for approximately four hours. Mother's attendance was sporadic, and Mother did not always follow the rules for supervised parenting time. Child's guardian ad litem (GAL) was present at each occasion that Mother had parenting time with Child. The GAL observed that Child appeared to be afraid during these visits and would visibly flinch if Mother moved quickly. After these interactions with Mother, Child would soil his bed at night, have tantrums, and self-harm through head banging, hitting, or scratching. Child did not exhibit these behaviors when Mother missed parenting time or was incarcerated. Mother would telephone Child's foster home at inappropriately early or late times and berate Child until he cried and

experienced insomnia. Child would attempt to avoid seeing Mother. Beginning in March of 2016, Child's GAL consistently, and, at times vehemently, requested that the trial court discontinue Mother's parenting time due to its negative effect on Child. In June of 2017, Child's GAL reported an incident to the trial court wherein Child, anticipating parenting time with Mother, pulled feces from his body and used it to write "don't make me go" on the refrigerator. Child was diagnosed with complex post-traumatic stress disorder due to his experiences in Mother's home.

[8]     From April of 2015 until June of 2017, Child's permanency plan was reunification with Mother. During the summer of 2017 after a putative father was excluded as Child's father, Child's permanency plan was altered from reunification to adoption. On August 25, 2017, the State filed a verified petition for involuntary termination of parent-child relationship (TPR), alleging, among other statutory considerations, that it was in Child's best interests to terminate Mother's[2] parental rights and that the State had a satisfactory plan for the care and treatment of Child, namely, adoption. Hearings on the TPR petition were held on November 22, 2017, January 29, 2018, and February 22, 2018. Mother did not appear for the January hearing, despite having notice of the time and date. Mother was not in contact with her attorney, was not incarcerated, and did not contact the trial court regarding her absence.

_____

[2] The parental rights of any putative fathers were also terminated in these proceedings.

[9]     FCM Rachel Leonard (FCM Leonard), who was on the case until approximately December of 2016, testified at the January TPR hearing that she never recommended placement of Child with Mother because conditions meriting the initial removal of Child from Mother's home were never remedied and because Mother did not participate in services regularly enough to address her own mental health needs. Mother had been ordered to maintain contact with FCM Leonard, but there were multiple occasions when Mother was incarcerated that DCS was not notified, and FCM Leonard only determined Mother's whereabouts by searching for Mother herself. Mother always told FCM Leonard that she wanted to participate in services, but Mother never followed through. FCM Leonard had concerns over Mother's ability to parent Child. FCM Leonard felt that the conditions that had merited removal of Child from Mother's home were not likely to be remedied because Mother did not participate in services, did not go to therapy, and did not take her medications.

[10]    FCM Julie Colen (FCM Colen), who succeeded FCM Leonard, testified at the January TPR hearing that Mother had not established a stable home and had made no progress through the case. In January of 2017, Mother moved to Lawrenceburg. DCS paid Mother's deposit and the first month's rent on a home for her. However, Mother only lived there until February of 2017, when Mother was incarcerated until May 27, 2107. After being released, Mother moved to a friend's home for a month. FCM Colen felt that, due to her frequent arrests and incarcerations, Mother was unavailable to parent. FCM Colen also felt that Mother had not addressed her mental health needs which

she believed would help Mother to be stable and to maintain a stable residence. Mother had reported to FCM Colen that she believed that she had mental health issues but that she did not require medication to treat them.

[11] FCM Colen also testified that Child had been in five different foster home placements since being removed from Mother's home. His first placement had been long-term, almost two years. Child's foster parents asked that he be moved due to behavioral issues. The other moves were also due to behavioral issues, except the last one which had been a pre-adoptive placement that fell through because the foster parents ultimately did not think Child would be a good fit in the home. Child had been in his most recent placement since December 15, 2017, and was doing better, academically and socially. Child's permanency plan was to have him adopted with Sister into the same home, but no adoptive family had been identified.

[12] Mother appeared for the February 2018 TPR hearing and reported that she was living in Ohio with her boyfriend. She was not currently taking any mental health medications. Mother felt that the CHIN case had been opened because bad blood existed between her and DCS workers due to a previous case.

[13] On March 14, 2018, the trial court issued its Order terminating Mother's parental rights. The trial court found that termination of Mother's parental rights was in Child's best interests because

> Mother continues to have issues with stable housing, although she is now living in Ohio with her current paramour. Mother's refusal to acknowledge her own mental health issues, as well as

her instability, places her child at continued risk of abuse or neglect.

(Appellant's Appendix, Vol. II, p. 30). The trial court also found that DCS had "a satisfactory plan for the care and treatment of [Child], which is: adoption." *Id*.

Mother now appeals. Additional facts will be added as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

It is well-settled that when reviewing the evidence supporting the termination of parental rights we neither reweigh the evidence nor determine the credibility of witnesses. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). In addition, we consider only the evidence that supports the judgment and the reasonable inferences to be drawn from that evidence. *Id*. "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id*. We do not set aside the trial court's findings or judgment unless it is clearly erroneous. *Id*.

## II. *Termination of Mother's Parental Rights*

"[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied.* Indeed, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id*.

(quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, parental interests are not absolute; rather, termination of parental rights is appropriate when parents are unable or unwilling to meet their parental responsibilities. *In re A.B.*, 887 N.E.2d 158, 164 (Ind. Ct. App. 2008).

[17] Termination of parental rights is an extreme sanction that is intended as a "last resort" and is available only when all other reasonable efforts have failed. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 91 (Ind. Ct. App. 2014). As such, before a termination of parental rights is merited, the State is required to prove a host of facts by clear and convincing evidence, the most relevant for our purposes being that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child.[3] Ind. Code §§ 31-35-2-4(b)(2)(C),(D); 31-37-14-2. We address each of those factors in turn.

### A. *Child's Best Interests*

[18] Our supreme court has recently recognized that one of the most difficult aspects of a termination of parental rights determination is the issue of whether the termination is in the child's best interest. *In re E.M.*, 4 N.E.3d at 647 (noting that the question "necessarily places the children's interest in preserving the

---

[3] Mother initially concedes that the State met its burden of proof as to all other statutorily mandated factors apart from showing termination was in Child's best interest, but she also makes a related argument that the State did not show that adoption was a satisfactory plan for Child. (Appellant's Brief pp. 13, 17-18).

family into conflict with their need for permanency."). The trial court's determination that termination was in the child's best interests requires it to look at the totality of the evidence of a particular case. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. "In doing so, the trial court must subordinate the interests of the parents to those of the children involved." *Id.*

[19] Here, the trial court found that termination was in Child's best interests because Mother continued to have issues with stable housing, refused to acknowledge her mental health issues, and was unstable. Regarding the issue of stable housing, the evidence indicated that Child was initially removed from Mother's home in part because she had no functioning utilities. Mother's home during sixteen months of the period preceding termination was jail or prison. The record is largely silent as to where Mother resided in between those periods of incarceration. Mother quickly lost a home DCS had helped her procure. Although Mother was living with her boyfriend in Ohio by the time of the last TPR hearing, she had only been there for approximately one month after being released from her latest period of incarceration, which was not a long enough period of time to establish a pattern of stability.

[20] As to her mental health issues, Mother did not comply with her treatment plan to attend behavioral therapy and medication management. Mother felt that she did not require medication and apparently stopped taking her medication without consulting any treating physician. At the time of the final TPR hearing, Mother was not taking any medication. In addition, during the course of the underlying CHINS proceedings and the TPR case, Mother threatened

Child's foster parents and caregivers, berated Child until he cried and had insomnia, and threatened to tear a fetus from a woman's womb and make her eat it. In light of this evidence, we cannot say that the trial court's conclusions regarding Mother's housing instability, unacknowledged mental health issues, and overall instability were clearly erroneous. *In re E.M.*, 4 N.E.3d at 642.

[21] Our review of the evidence as a whole leads us to adopt the trial court's conclusion that termination was in Child's best interests because that conclusion was supported by clear and convincing evidence and was not clearly erroneous. *Id.* By the time DCS sought to terminate Mother's parental rights, Child had been removed from Mother's care for approximately twenty-eight months. Mother was incarcerated for a significant amount of that time period, sixteen months, during which she did not parent Child, as there is no evidence in the record that Mother attempted to maintain her parental relationship with Child or pursue the goals of her case management plan during her periods of incarceration. When Mother was not incarcerated, her parenting time with Child was sporadic and resulted in severe harm to Child, who acted out and self-harmed before and after seeing Mother. The FCMs felt that Mother made little to no progress in bettering her ability to parent Child despite the resources provided to her through DCS. In addition, Child's GAL repeatedly urged the trial court to terminate Mother's parental rights so that Child could be adopted.

[22] Nevertheless, Mother argues that we should reverse the trial court's determination because "Indiana appellate courts have long recognized that incarceration is an insufficient basis for terminating parental rights."

(Appellant's Brief p. 15). While we agree with this proposition as a general matter, this argument is misplaced, as the trial court did not list Mother's incarceration specifically as one of the factors it relied upon in reaching its determination regarding Child's best interests, and we do not rely upon that factor exclusively in reaching our conclusion on review. In addition, the case relied upon by Mother in support of her argument, *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), *reh'g denied*, is factually distinguishable, because our supreme court found that termination was not merited where mother had maintained a relationship with her child during incarceration and made a good faith effort to better herself as a person and a parent while imprisoned, both factors that, as noted above, are not present here. *Id.* at 1262, 1264. Based on the totality of the evidence, we will not disturb the trial court's conclusion that termination of Mother's rights was in Child's best interests.

## B. *Plan for Child's Treatment and Care*

[23] In a related argument, Mother contends that adoption as the plan for Child's treatment and care was not in his best interests. "In order for the trial court to terminate the parent-child relationship the trial court must find that there is a satisfactory plan for the care and treatment of the child." *In re D.D.*, 804 N.E.2d at 268. The plan for care and treatment need not be detailed if it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.* A plan to attempt to find suitable parents to adopt a child is a satisfactory plan. *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) ("[T]here need not be a guarantee that a suitable adoption will take

place, only that DCS will attempt to find a suitable adoptive parent."), *trans. denied*. However, in order to be viable, a permanency plan must have some likelihood of coming to fruition. *A.K.G. v. Ind. Dep't of Child Servs.*, 92 N.E.3d 1083, 1085 (Ind. 2017).

[24] Here, Child had been in a series of foster care placements for varying periods of time. Child had been in a pre-adoptive placement which did not come to fruition due to reasons which were not entirely clear from the record. Child was doing better in his last placement. Thus, Child had some placement issues, but we cannot say that it is clear from the record before us that there was no likelihood that Child would ever be adopted. While acknowledging that adoption is usually an adequate plan for a child despite the lack of identification of a pre-adoptive home, Mother argues that this plan was not in Child's best interests given the specific circumstances of this case. In support of her argument, Mother directs our attention to evidence in the record that does not support the trial court's conclusion that adoption was an adequate plan for Child, which is unpersuasive given our standard of review. *In re E.M.*, 4 N.E.3d at 642. We will not disturb the trial court's determination that termination of Mother's parental rights was in Child's best interests based upon the DCS satisfactory plan of adoption for Child.

## CONCLUSION

[25] Based on the foregoing, we conclude that the trial court's conclusions, namely that termination of Mother's parental rights was in Child's best interests and

that a satisfactory plan for Child was in place, were supported by clear and convincing evidence and were not clearly erroneous.

[26] Affirmed.

[27] Vaidik, C. J. and Kirsch, J. concur