# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 23 2019, 9:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Mark A. Delgado
Monticello, Indiana

Benjamin J. Church
Monticello, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of K.C. (Minor Child),

and

B.C. (Mother) and B.C. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 23, 2019

Court of Appeals Cause No. 18A-JT-1755

Appeal from the White Circuit Court

The Honorable Robert W. Thacker, Judge

Trial Court Cause No. 91C01-1712-JT-28

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Respondents, B.C. (Mother) and B.C. (Father), (collectively, Parents), appeal from the trial court's order terminating their parental rights to their child, K.C. (Child).

We affirm.

## ISSUE

Parents present four issues on appeal, which we consolidate and restate as: Whether the trial court's findings and conclusions support the judgment terminating their rights to Child.

## FACTS AND PROCEDURAL HISTORY

Child was born on February 8, 2016, to Mother and Father, for whom paternity was established by affidavit and a court proceeding. On August 6, 2016, the Department of Child Services (DCS) received a report that Parents were engaging in domestic violence in Child's presence, Parents were using illegal controlled substances while caring for Child, and Parents were about to be evicted from their home. A family case manager (FCM) visited the home and interviewed Mother, who admitted to ingesting methamphetamine and confirmed that they were about to be evicted for non-payment of rent. Mother subsequently tested positive for methamphetamine. A hair-follicle test was performed on Child. The cut-off level for testing was 500pg/mg; Child tested at 2,741 pg/mg. Child was removed from Parents' care and placed with his paternal aunt and uncle.

[5]     On August 12, 2016, DCS filed a petition alleging that Child was a child in need of services (CHINS). On August 25, 2016, Parents admitted to the allegations in the petition. On October 4, 2016, the CHINS court entered its dispositional decree ordering Parents to refrain from possessing and consuming illegal controlled substances, complete a substance abuse assessment, follow and complete substance abuse treatment recommendations, refrain from acts of domestic violence and other criminal activity, maintain stable housing, and maintain employment.

[6]     Beginning in September 2016, Parents were provided a number of services, including substance-abuse treatment, home-based case management to address housing and employment issues, individual therapy, and couples therapy. From September to December 2016, Parents completed a substance-abuse assessment, participated in intensive outpatient treatment, and had negative drugs screens. Parents engaged in supervised visitation and their other services. Father was employed. On December 22, 2016, in light of this progress, DCS initiated a trial home visit for Child. On February 6, 2017, Parents tested positive for marijuana. On February 8, 2017, Parents were interviewed by DCS and admitted to using heroin. Child was removed from Parents' care and placed again with his paternal aunt and uncle, where Child has resided since. After Child's removal, Father binged on drugs for two weeks and lost his employment. Mother continued to engage in services. During the DCS reporting period from December 2016 to April 11, 2017, there were two domestic violence incidents between Parents.

[7]     From April 11, 2017, to June 30, 2017, Mother maintained employment and engaged in visitation and other services. Mother was referred to intensive outpatient therapy, which she did not complete. Mother did not have a permanent address and stayed with a series of friends, some of whom were known to DCS to have substance-abuse issues. On June 6, 2017, just before Child was to arrive for a scheduled visit, Father physically assaulted Mother by placing her in a headlock and ripping out one of her earrings. Father was arrested following this incident. As a result of a separate incident in June, Father was arrested on a second occasion and charged with criminal recklessness, resisting law enforcement, and battery. Father was evicted from his home. As a result of these events, DCS changed Child's permanency plan from reunification to add a concurrent plan of adoption by paternal aunt and uncle.

[8]     From June 30, 2017, to September 29, 2017, Father was incarcerated. He completed an anger-management program while in jail. Mother continued to reside with friends. Mother was terminated from her retail employer when she was charged with theft from the store. During this reporting period, Mother tested positive for marijuana and methamphetamine.

[9]     From September 29, 2017, to January 9, 2018, Father was released from jail and was referred to intensive outpatient therapy, home-based case management, and supervised visitation with Child. On November 27, 2017, Father's probation was revoked due to his testing positive for methamphetamine, morphine, and marijuana. Although Mother participated

in supervised visitation and home-based case management, she was not employed, had no stable address, and tested positive for methamphetamine on December 28, 2017. During this period, Parents continued to engage in verbal altercations. On December 28, 2017, DCS filed a petition seeking the involuntary termination of Mother and Father's parental rights (TPR).

[10] Between January 9, 2018, and May 2018, Father was incarcerated on work release and did not participate in services. Mother continued to participate in visitation with Child and home-based case management but was arrested in February and charged with methamphetamine possession, marijuana possession, and driving without a license. On April 12, 2018, Mother tested positive for methamphetamine. Parents continued to engage in verbal altercations.

[11] On May 3, 2018, the trial court held a hearing on the TPR petition. By that time Child was twenty-seven months old and had been placed with his aunt and uncle for twenty months. Parents visited with Child for two hours each week. Mother was not participating in substance-abuse treatment and admitted that she did not know how to overcome her addiction to methamphetamine. Mother blamed her continued drug use on being around the wrong kind of people. Mother was not employed but hoped to procure summer cleaning work. Mother was living with a friend and acknowledged that she could not maintain housing on her own. Mother had pending criminal charges related to her theft from her previous employer. According to Mother, her life with Father and Child was going well until DCS removed Child from her care.

[12] At the time of the TPR hearing, Father expected to complete his sentence on work release by the end of May 2018. Father was drug tested every two weeks while on work release and was experiencing his longest period of sobriety. Father expected to live with his father after being released from work release. Father was employed earning $9.00 per hour. Father related an incident that had happened just the day before the hearing wherein Mother had come to his place of work with someone else and followed him after he left work to return to the jail, which concerned him.

[13] Parents' FCM noted that even though they knew what they had to do to succeed, Parents' maturity level had decreased through the case and that they had displayed an inability to co-parent effectively. The FCM opined that, despite their initial success with services, Parents had made no progress in their case, that the substance abuse, domestic violence, and housing instability that had resulted in Child's removal still existed and were unlikely to change, and that it was in Child's best interests that Parents' rights be terminated. Parents' home-based therapist testified that they initially did well with couple's therapy but had regressed since February 2017. The therapist opined that Parents were unable to follow through with their stated desire to make progress and that they never achieved the ability to care for themselves or Child. A second case worker who had worked with Parents from March 2017 to the time of the TPR hearing testified that she had worked with Parents on the issues of employment, housing, and sobriety and that, although Parents attended meetings, they made no progress on their issues and did not use resources between meetings. Child's

guardian *ad litem* (GAL) reported that Child had bonded to his aunt and uncle. The GAL expressed concern and that Child's sense of safety and security would be significantly negatively impacted if he were placed again with Parents and then removed again if the placement failed.

[14] On July 12, 2018, the trial court entered its order terminating Parents' rights to Child. The trial court entered eighty-two (82) detailed findings supporting its conclusion that the conditions which resulted in Child's removal and continued placement outside of the home will not be remedied, including the following:

> 1. The child is approximately 27 months old and has been placed in the care of his paternal uncle and aunt . . . through the entirety of the underlying CHINS case, and has been out of the care and custody of his parents for 20 months. The child has done well with placement, and is bonded with placement, and placement is willing and wanting to adopt the child as he has been in their home for the majority of his life.
>
> * * *
>
> 8. [The FCM] testified that the reasons for removal will not be remedied because of the continued drugs use by the parents, the instability of Mother due to the lack of employment or housing, the domestic violence between the parents, and the repeated incarceration of Father and Mother.
>
> 9. [The FCM] testified that the parents presented more maturely at the beginning of her involvement but have presented less maturely currently. Their behaviors are not appropriate, and they do not present able [sic] to co-parent for the best interest of the child.
>
> 10. [The FCM] testified that the parent's [sic] had a clear understanding of what they needed to accomplish and when in order to reunify but were unable to follow through and this lack of motivation and consistency is a concern for returning the child to the care and custody of the parents.

* * *

14. [The FCM] testified that the parents have struggled with illegal drug use, a [sic] unstable and unhealthy relationship, and housing and employment instability through the course of the case.

15. [The FCM] testified that after the [trial home visit] was terminated there was never another time when DCS considered returning the child to the home of either parent.

* * *

21. [The home-based case manager] testified that a major roadblock for progress was a lack of follow through and motivation. (State's Group Exhibit F).

* * *

32. [Parents' therapist] testified that the parents have not made any significant progress.

* * *

41. Mother has not had stable housing or stable employment through the entire pendency of the companion CHINS case.

42. [The case worker] testified that there is not any tangible progress towards goals.

43. Father was not compliant with services throughout the case when he was not incarcerated. He was inconsistent with meeting, and showed insignificant progress towards goals. (State's Exhibit G).

* * *

48. Mother and Father are inconsistent with home base [sic] case management and have not made individual progress toward goals established in this service. (State's Group Exhibit C).

* * *

63. Father testified that he does not have a plan to ensure sobriety nor does the Father have a relapse prevention plan other than just not using illegal drugs.

* * *

72. [The GAL] testified that throughout the case there has been [a] repeated pattern of drug use and that it is unclear whether there will be a change in that pattern that has not changed in the entire case.

* * *

75. [The GAL] testified that while the parents care about the child, they have been unable to pull it together throughout the entire case to be able to take care of the child.

* * *

78. [The GAL] testified that the child needed permanency and stability.

(Mother's App. Vol. II, pp. 8-17).

The trial court made the following findings supporting its conclusion that termination of Parents' rights to Child was in Child's best interests:

1. [The FCM] testified that the termination was in the child's best interest in that Mother and Father continue to struggle with substance use, have not successfully completed treatment, are inconsistent with services.

2. [The FCM] testified that the termination was in the child's best interest because Mother continues to struggle with housing instability and employment instability, and the child needs stability and permanency that cannot be provided by the parents.

3. [The FCM] testified that termination is in the child's best interested [sic] because the parent's [sic] continue to struggle with domestic violence and an unhealthy relationship that has negatively impacted their ability to parent.

4. [The GAL] testified that the child needs permanency due to his young age, and due to the risk of an attachment disorder.

5. [The FCM] testified that the child has been removed from the parents 20 months out of his 27 month life and is well bonded with [his] placement.

6. The child has lived in placement care for his entire life, and has a bond with paternal uncle and aunt.

7. [The FCM] testified that the same concerns that resulted in the child's removal remain, and the parents are unable to provide a stable safe home environment free from abuse and neglect.

(Mother's App. Vol. II, pp. 18-19).

[16] Parents now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[17] It is well-settled that when reviewing the evidence supporting the termination of parental rights we neither reweigh the evidence nor determine the credibility of witnesses. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). In addition, we consider only the evidence that supports the judgment and the reasonable inferences to be drawn from that evidence. *Id*. "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id*. We must give due regard to the trial court's opportunity to judge the credibility of witnesses firsthand, and we do not set aside the trial court's findings or judgment unless it is clearly erroneous. *Id*.

## II. *Termination of Parents' Rights*

[18] "[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied.* Indeed, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, parental interests are not absolute; rather, termination of parental rights is appropriate when parents are unable or unwilling to meet their parental responsibilities. *In re A.B.*, 887 N.E.2d 158, 164 (Ind. Ct. App. 2008).

[19] Termination of parental rights is an extreme sanction that is intended as a "last resort" and is available only when all other reasonable efforts have failed. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 91 (Ind. Ct. App. 2014). As such, before a termination of parental rights is merited, the State is required to prove a host of facts by clear and convincing evidence, the most relevant for our purposes being that there is a reasonable probability that the conditions which resulted in the child's removal and continued placement outside the home will not be remedied by the parents and that termination is in the best interests of the child. Ind. Code §§ 31-35-2-4(b)(2)(B)(i), (C); 31-37-14-2. We address each of those factors in turn.

A. *Reasonable Probability Conditions Will Not Be Remedied*

[20] When reviewing a trial court's determination that the conditions that resulted in the child's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-43. First, we must identify the conditions that led to removal; second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. at 643. When engaging in the second step of this analysis, a trial court must judge a parent's fitness as of the time of the TPR proceeding, taking into account evidence of changed conditions, balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. This delicate balance is entrusted to the trial court, and a trial court acts within its discretion when it weighs a parent's prior history more heavily than efforts made only shortly before termination. *Id*. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id*.

[21] Here, only Mother argues that the trial court's findings and conclusions on this factor were unsupported, and so we direct our analysis on this issue only to the findings and conclusions pertaining to her. Child was initially removed from Mother's care due to her drug use, domestic violence between her and Father, and housing instability. Evidence in the record showed that Mother tested positive for methamphetamine when Child was removed and that, despite some initial success and some continued engagement in services, she continued to test

positive for methamphetamine and marijuana throughout the pendency of the CHINS proceedings and this case. Indeed, even after DCS filed its TPR petition, Mother was arrested in February of 2018 for methamphetamine and marijuana possession, and she last tested positive for methamphetamine in April 2018, just weeks before the scheduled TPR hearing. The trial court credited testimony by the FCM, Mother's therapist, and the GAL that Mother had failed to make progress on her substance abuse and that it was unclear whether there would be a change in that pattern. We conclude that the evidence supported the trial court's findings and that its findings supported its conclusion that there was a reasonable probability that Mother's substance abuse would not be remedied.

[22] Regarding the incidents of domestic violence between Mother and Father, the evidence showed that during the pendency of the CHINS case, a serious incident occurred on June 6, 2017, when Father battered Mother just before Child was to arrive for a visit, resulting in his arrest. Mother continued her relationship with Father during his periods of incarceration. Even after receiving couples and individual therapy, Mother and Father continued to engage in verbal disputes. Father related at the TPR hearing that the day before the hearing Mother had come to his place of work and followed him when he left, which concerned him. The trial court credited testimony by the FCM, Mother's therapist, and the GAL that she had failed to make progress on goals, that Mother's maturity level had regressed through the case, and that continued incidents of domestic violence would not be remedied. We conclude that the

trial court's findings were supported by the evidence and that its findings supported its conclusion that there was a reasonable probability that the domestic violence between Parents would not be remedied.

[23] As to Mother's housing instability, the evidence showed that throughout the pendency of the CHINS and the TPR proceedings, when she was not incarcerated, Mother had no fixed address and resided with a series of friends, some of whom were known to DCS as having substance-abuse issues. Mother received assistance and training from her home-based case manager to address her housing instability, yet she made no progress in addressing this issue. At the time of the TPR hearing, Mother had been living with yet another friend for a month after being released from incarceration. In its findings, the trial court credited testimony by the FCM, the home-based case manager, and the case worker that Mother continued to struggle with housing, she had made no progress towards her goal of stable housing, and her housing instability would not be remedied. We conclude that these findings were supported by the evidence and that the trial court's conclusion that there was a reasonable probability that Mother's housing instability would not be remedied was supported by those findings.

[24] Nevertheless, Mother argues that she had made progress in addressing her substance-abuse issues, she had made efforts to change, and she had removed herself from her relationship with Father. We find these arguments unpersuasive given our standard of review which compels us to only consider evidence that supports the trial court's determinations and to refrain from

reweighing the evidence. *E.M.*, 4 N.E.3d at 642. In addition, we note that, particularly in regards to the domestic violence between Parents, it was within the trial court's discretion to weight more heavily the historic pattern of violence between them in face of Mother's claims at the TPR hearing that she had separated herself from Father and to determine that Parent's past behavior was more indicative of their future behavior. *Id.* at 642-43.

[25] Mother also likens her case to *In re J.M.*, 908 N.E.2d 191, 194 (Ind. 2009), which we find to be factually distinguishable because the reason for removal in that case was the fact that both parents were incarcerated, not drug use, domestic violence, and housing instability. We find this comparison unpersuasive for the additional reason that in *J.M.*, our supreme court reversed the decision of another panel of this court because it had declared the trial court's determination clearly erroneous based on evidence which did not support the trial court's determination, something which Mother now invites us to do. *Id.* at 193-95. Because the evidence supports the trial court's findings which supports its conclusion that there was a reasonable probability that Mother's substance abuse, domestic violence, and housing instability issues would not be remedied, we find that the trial court's determination was not clearly erroneous. *E.M.*, 4 N.E.3d at 642.

### B. *Child's Best Interests*

[26] Mother and Father challenge the trial court's conclusion that termination of their parental rights was in Child's best interests. Our supreme court has recently recognized that one of the most difficult aspects of a termination of

parental rights determination is the issue of whether the termination is in the child's best interest. *Id.* at 647 (noting that the question "necessarily places the children's interest in preserving the family into conflict with their need for permanency"). The trial court's determination that termination was in the child's best interests requires it to look at the totality of the evidence of a particular case. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. "In doing so, the trial court must subordinate the interests of the parents to those of the children involved." *Id*.

[27] Here, supporting its conclusion that termination was in Child's best interests, the trial court found that Parents continued to struggle with substance abuse and an unhealth relationship that negatively impacted their ability to parent. The trial court credited the FCM's testimony that it was in Child's best interests to terminate Parents' rights because Mother continued to struggle with housing and employment stability and Child needed stability and permanency that Parents could not provide. The trial court also credited testimony by the FCM and the GAL that Child was at risk for attachment disorder due to his young age and that Child was well-bonded with paternal aunt and uncle, with whom Child had resided for twenty of the twenty-seven years of his life. It was within the trial court's jurisdiction to weigh the competing interests in this case, and, given the trial court's findings and our deference to the trial court's ability to weigh the evidence firsthand in such matters, we cannot conclude that its determination that termination was in Child's best interests was clearly erroneous. *E.M.*, 4 N.E.3d at 642.

[28] Neither Mother nor Father appear to challenge the evidence supporting the trial court's findings on this issue. Rather, Father argues that, because Child was in a stable placement with relatives and he had made positive strides to address his drug addiction, he should have been given more time to show that he could effectively parent Child. Father likens his case to *In re R.S.*, 56 N.E.3d 625 (Ind. 2017), in which our supreme court reversed a trial court's order terminating a father's parental rights, finding that the trial court's determination was clearly erroneous given the trial court's own findings that father kept in contact with child during his lengthy incarceration, completed several programs to better himself while incarcerated, completed fifty-two weeks of domestic violence counseling as a condition of his probation, and that it would be best for child and father to continue visitation. *Id.* at 629. The supreme court also found it significant that the child, who was ten-years-old at the time of the TPR, had been placed with a relative for years, and, thus, prolonging child's adoption was unlikely to have an effect on the child. *Id.* at 630.

[29] We do not find Father's comparison of his case to *R.S.* to be apt. Father's recent efforts and accomplishments towards his sobriety are to be commended. However, there was no evidence that Father took significant measures to better himself during his periods of incarceration, made any long-term treatment efforts, or that he shared as close a bond with Child as the father did with R.S. In addition, there was no recommendation or conclusion here by the trial court that Father continue to visit with Child. R.S. was also much older than Child, and there was no evidence that R.S. was at risk for attachment disorder as the

trial court found Child was in this case. Thus, we do not conclude that the fact that Child was placed with relatives made the trial court's best interests determination clearly erroneous.

[30] Mother develops her argument as to Child's best interests through an extended comparison of her circumstances to those of *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), in which our supreme court reversed a trial court's TPR determination because none of the four findings the trial court relied upon to conclude termination was in child's best interests was supported by the evidence. In *G.Y.*, mother was arrested and incarcerated for dealing cocaine, an offense she had committed a year before her child was born. *Id*. at 1258. There was no evidence that she had been involved in criminal activity during the twenty months child was in her care after the offense or that she had been an unfit parent in any other way. *Id*. Before being incarcerated, mother made multiple unsuccessful attempts to place child with a relative before DCS removed child from her care. *Id*.

[31] The trial court eventually terminated mother's parental rights based on its conclusions that mother was unavailable to parent due to her likelihood of reoffending, providing mother additional time to be released from jail and to try to remedy removal issues would unnecessarily delay permanency for the child, child had a closer bond with his foster parents than with mother, and child had a general need for permanency and stability. *Id*. at 1262-66. In finding that the trial court's conclusion that child was better bonded with his foster family than his mother was clearly erroneous, the court found that mother had exercised

regular, positive visitation once a month with her child while incarcerated. *Id*. at 1264. The court also found it significant that mother had made strenuous efforts from the moment of her arrest and throughout her incarceration to place her child with a family member. *Id*. at 1265.

[32] As to the trial court's finding that G.Y. was in general need of permanency and stability, the court held that this finding was clearly erroneous because, although the GAL recommended termination due to child's need for permanency and stability, the GAL also opined that it was in G.Y.'s best interests to continue contact with mother in the future. *Id*. The court also found it significant in weighing G.Y.'s interest in permanency through adoption against his interest in remaining in foster care pending mother's release that mother had completed an eight-week drug rehabilitation program while incarcerated, refrained from using cocaine for a number of years, completed a fifteen-week parenting class, was actively participating in a program to improve her employment prospects after release, was working towards an associate's degree, and had demonstrated a willingness to continue in parenting and improvement classes after her release. *Id*. at 1262, 1265.

[33] While it is almost always possible to distinguish the facts of one TPR case from another given the highly fact-sensitive nature of the inquires involved, even with broadest of approaches we find *G.Y.* to be inapposite to the present case. Because the trial court made no findings regarding Mother's likelihood of re-offending and Mother was not awaiting release from incarceration, the first two factors analyzed by the court in *G.Y.* do not apply here. However, even if those

factors were applicable, Mother's argument on those points largely consists in directing our attention to facts that do not support the trial court's judgment, such as her hope to procure part-time cleaning work and her stated desire to remove herself from Father. This argument is unavailing given our standard of review which precludes us from considering such evidence. *In re E.M.*, 4 N.E.3d at 642.

[34] The trial court did find that Child was well-bonded with his pre-adoptive placement, but it made no finding that Child was better bonded with his placement than with Mother akin to the finding at issue in *G.Y.* However, even if it had made such an express finding, unlike the circumstances of *G.Y.*, there was nothing in the record beyond Mother's regular visitation that renders the trial court's determination here clearly erroneous. Mother also argues that she "was never given a substantial opportunity to show that she could provide for the minor child and be a full-time parent after removal" which she maintains indicated that DCS had pre-determined that foster care and adoption was better for Child because his aunt and uncle were more financially secure than she. However, Mother had the opportunity to show her parenting ability when Child was returned to her home for the trial home visit in December of 2016. Child was removed in February of 2017 when Mother and Father used heroin and marijuana while Child was in their care.

[35] As to the trial court's finding that Child was in need of permanency and stability, unlike the facts of *G.Y.*, there was no recommendation by the GAL or anyone else in this case that visitation or contact be maintained by Parents with

Child. In addition, Mother did not make any progress in her case comparable to the sustained and significant efforts displayed by G.Y.'s mother. In light of the totality of the findings supporting the trial court's conclusion that termination of Parents' rights was in Child's best interest, we conclude that its order terminating their rights to Child was not clearly erroneous. *E.M.*, 4 N.E.3d at 642.

## CONCLUSION

[36] Based on the foregoing, we conclude that the evidence supported the trial court's findings which supported its conclusions that there was a reasonable probability that the conditions which merited removal would not be remedied and that it was in Child's best interests to terminate Parents' rights to Child.

[37] Affirmed.

[38] Kirsch, J. and Robb, J. concur