# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 31 2019, 11:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ronald J. Moore
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

S.R. and D.R. (Minor Children),
and

A.F. (Mother) and R.R. (Father),

*Appellants-Respondents,*

      v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

July 31, 2019

Court of Appeals Case No.
19A-JT-554

Appeal from the Wayne Superior Court

The Honorable Darrin M. Dolehanty, Judge

Trial Court Cause No.
89D03-1809-JT-25 & 89D03-1809-JT-26

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Respondents, A.F. (Mother) and R.R. (Father) (collectively, Parents), appeal the trial court's Order terminating their parental rights to their minor children, S.R. and D.R., (collectively, Children).

We affirm.

## ISSUE

Parents present us with one issue on appeal, which we restate as: Whether the trial court's Order terminating Parents' parental rights to Children was clearly erroneous.

## FACTS AND PROCEDURAL HISTORY

S.R. and D.R. were born to Parents on June 6, 2008, and October 1, 2013, respectively. Parents' involvement with DCS began in December 2016 when a report was filed that Parents were using drugs, had unstable housing, and S.R. was not attending school. DCS was unable to investigate those allegations. On December 11, 2016, Children were present when a violent argument occurred in their home between their aunt and her husband which resulted in Mother's front tooth being knocked out when she attempted to intervene. The home was littered in broken glass; there was blood on the walls; loose medication was left on the floor. When Father arrived home that evening, he was arrested. Father

subsequently admitted to swallowing an "eight ball" of heroin and an unknown quantity of methamphetamine. (Transcript p. 28).

[5] DCS investigated and created a safety plan for Children so that they could remain in the home with Mother and their aunt. That plan called for the broken glass, pills, and blood to be cleaned up so that Children could have a safe environment. The plan also called for S.R. to be enrolled in school. On December 13, 2016, DCS received a report that S.R. had not been enrolled in school. DCS re-inspected the home and found that none of the hazardous conditions addressed in the safety plan had been rectified. In addition, when DCS arrived, D.R. was unclothed and unattended, as Mother was unconscious on the couch. Children were removed from Parents and placed in the care of a kinship placement,[1] where they have remained ever since.

[6] DCS pursued CHINS proceedings, and, on January 14, 2017, after Parents admitted substance abuse and that Children were CHINS, Children were adjudicated CHINS. As part of the CHINS dispositional orders, Mother and Father were directed to undergo substance abuse, domestic violence, and parenting assessments, complete all resulting treatment recommendations, maintain stable housing and employment, and refrain from using illegal substances. The permanency plan for the family was initially reunification.

---

[1] The exact relationship of the kinship placement to Children is not apparent from the record.

[7]     Parents did not comply with the services ordered as a result of the CHINS. Mother did not maintain regular contact with family case manager Sheryl Becker (FCM Becker). Although Mother completed a number of substance abuse assessments, she did not go through recommended treatment and did not refrain from using illegal substances. Mother submitted only one clean drug screen out of twenty-two screens done throughout the CHINS and TPR proceedings, consistently testing positive for methamphetamine. Mother did not exercise regular supervised parenting time with Children. In 2017, Mother made eight of the possible fifty visits with Children; in 2018 she made twenty-seven of the possible forty-three visits offered. Father was incarcerated throughout most of the CHINS proceedings and was unable to comply with services, but he did not contact FCM Becker, submit any drug screens, undertake any services, or arrange for parenting time with Children during a four-month period when he was released between periods of incarceration. Other than speaking with Children twice over the telephone over the span of the CHINS proceedings, Father did not attempt to maintain any relationship with Children while incarcerated. On December 15, 2017, the trial court added a concurrent plan of adoption to the permanency plan.

[8]     On September 19, 2018, DCS filed a petition seeking to terminate Parents' parental rights to Children (TPR). On December 18, 2018, the trial court held a hearing on the TPR. FCM Becker testified that Parents had not made any progress in their services. Mother continued to be non-compliant with her substance abuse treatment. Mother had tested positive for methamphetamine

as recently as November 28, 2018. Father, who was still incarcerated, had requested treatment in June 2018 but was on a prison waiting list for a program. Father had a lengthy criminal record of felony and misdemeanor convictions and had pending felony theft, theft, and conversion charges. FCM Becker testified that DCS's plan for Children's care and treatment was to have them adopted by their kinship placement. FCM Becker had observed that Children were supported by their kinship placement, and she had no concerns about the kinship placement adopting Children. Other than supervised visits with Mother and reading tutoring for S.R., Children were receiving no services through DCS. FCM Becker observed that Children were bonded with their kinship placement and that the kinship placement put Children's needs first, including supporting their extracurricular activities and hobbies such as choir and plays.

[9] On February 8, 2019, the trial court entered its Order terminating Parents' rights to Children in which it made the following relevant findings of fact:

> 35. Should the Petition to Terminate be granted, [DCS's] plan is for adoption of both [C]hildren by the current placement.
>
> 36. The [C]hildren are bonded with their placement. They are doing well.
>
> 37. In the current placement, the [C]hildren's needs are placed first. The [C]hildren are taken on family vacations.
>
> 38. The kinship placement is providing support for the [C]hildren's activities including choir and participation in plays.

39. The family has provided transportation for Mother to participate in the [C]hildren's plays.  They have taken her out to eat afterwards.

(Appellants' App. Vol. II, p. 34).

Parents now appeal.  Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I.  *Standard of Review*

Parents challenge the sufficiency of the evidence supporting the trial court's TPR Order.  It is well-settled that when reviewing the evidence supporting the termination of parental rights we neither reweigh the evidence nor determine the credibility of witnesses.  *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014).  In addition, we consider only the evidence that supports the judgment and the reasonable inferences to be drawn from that evidence.  *Id*.  "We confine our review to two steps:  whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment."  *Id*.  We must give due regard to the trial court's opportunity to judge the credibility of witnesses firsthand, and we do not set aside the trial court's findings or judgment unless it is clearly erroneous.  *Id*.  "Clear error is that which leaves us with a definite and firm conviction that a mistake has been made."  *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 93 (Ind. Ct. App. 2014) (quotation omitted).

[12] "[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied.* Indeed, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, parental interests are not absolute; rather, termination of parental rights is appropriate when parents are unable or unwilling to meet their parental responsibilities. *In re A.B.*, 887 N.E.2d 158, 164 (Ind. Ct. App. 2008).

[13] Termination of parental rights is an extreme sanction that is intended as a "last resort" and is available only when all other reasonable efforts have failed. *C.A.*, 15 N.E.3d at 91. As such, before a termination of parental rights is merited, the State is required to prove a host of facts by clear and convincing evidence, the most relevant for our purposes being that DCS has a satisfactory plan for the child's care and treatment. Ind. Code §§ 31-35-2-4(b)(2)(D); 31-37-14-2.

[14] Parents claim that the trial court's findings 35 and 36—that the plan for Children was adoption and that the Children were doing well in their placement—were not supported by the evidence. As Parents recognize, DCS's plan for a child's care and treatment "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated*." In re Termination of Parent-Child Relationship of*

*D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. A trial court's finding of this general sense of direction and satisfactory plan may be based entirely on a DSC caseworker's testimony. *See In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009) (finding evidence of a satisfactory plan where the DCS caseworker testified that the child had been living with his godparents for one year and the plan was adoption); *see also A.J. v. Marion Co. Office of Family and Children*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008) (sufficient evidence of a plan where DCS caseworker testified that the plan was adoption, the children were in pre-adoptive foster homes, and the children were doing well), *trans. denied; Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) ("[C]aseworker Allen testified that the plan for the care and treatment of [the children] is adoption. This is a satisfactory plan.").

[15] Here, Children had been living with their kinship placement for two years. FCM Becker testified that the plan for Children was adoption by their kinship placement, Children were bonded with and supported by their placement, and that Children were not in need of any therapeutic or remedial services apart from reading tutoring for S.R. In light of this evidence, we cannot say that the trial court's findings that the plan was adoption and that Children were doing well in their placement were unsupported by the evidence.

[16] Parents claim that the evidence supporting the trial court's finding that the plan was adoption was insufficient because it was based entirely on FCM Becker's testimony and there was no evidence provided of the feasibility or likelihood of the proposed kinship adoption. However, as set forth above, findings and

conclusions regarding a satisfactory plan may be based solely on the testimony of a DCS caseworker such as FCM Becker. In addition, in order to show a satisfactory plan, it is not necessary for DCS to identify a specific family that will adopt, much less that the adoption is feasible or likely. *See*, *e.g.*, *Long v. Starke Co. Office of Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007) ("The fact that there was not a specific family in place to adopt the children does not make the plan unsatisfactory."), *trans. denied*.

[17] Parents' challenge to the trial court's finding that the Children were doing well in their kinship placement is that FCM Becker testified that the younger child, D.R., has cried after parenting time with Mother was over, FCM Becker's testimony showed that visits with Mother were vital to S.R.'s well-being, and that there was no evidence regarding how Children have coped with Father being incarcerated. Inasmuch as these contentions invite us to consider evidence that does not support the trial court's determination or to reweigh the evidence of the case, they are unavailing, as we are precluded from doing so pursuant to our standard of review. *See In re E.M.*, 4 N.E.3d at 642. However, evidence that Father has been incarcerated throughout the CHINS and TPR proceedings, did not maintain contact with Children, and Children were doing well supports a reasonable inference that Children are coping well with Father's incarceration. Lastly, inasmuch as Parents argue that that there was no showing that the adoption was in Children's best interest, this court has noted that question is one to be resolved during an adoption proceeding, not during a TPR proceeding. *In re J.C.*, 994 N.E.2d at 290-91. Concluding that the

challenged findings were supported by the evidence, we find that the trial court's TPR Order was not clearly erroneous. *See In re E.M.*, 4 N.E.3d at 642.

# CONCLUSION

Based on the foregoing, we conclude that the trial court's findings were supported by the evidence and that, therefore, its TPR Order was not clearly erroneous.

Affirmed.

Vaidik, C. J. and Bradford, J. concur